[Civ. No. 23195. Third Dist. Dec. 18, 1984.]

BMW OF NORTH AMERICA, INC., Plaintiff and Appellant, ·v.
NEW MOTOR VEHICLE BOARD, Defendant and Respondent;
HAL WATKINS CHEVROLET, INC.,
Real Party in Interest and Respondent.

**COUNSEL**

Lewis, D'Amato, Brisbois & Bisgaard, Roy M. Brisbois, Weil, Gotshal & Manges, Salem M. Katsh, Michael A. Epstein, Bryan R. Dunlap and Sanford F. Remz for Plaintiff and Appellant.

Gene Erbin, Elizabeth A. Mulroy, McCuthchen, Black, Verleger & Shea, Howard K. Privett, Franklin H. Wilson, Michael M. Johnson, William H. Crabtree and Charles H. Lockwood as Amici Curiae on behalf of Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Harold W. Teasdale and Gordon Zane, Deputy Attorneys General, for Defendant and Respondent.

Crow, Lytle, Gilwee, Donoghue, Adler & Weninger, Richard E. Crow and James R. McCall as Amici Curiae on behalf of Defendant and Respondent.

Pilot & Spar, A. Albert Spar, Michael J. Flanagan and June Spar for Real Party in Interest and Respondent.

## OPINION

**SPARKS, J.**—In this appeal we consider the statutory restrictions on the modification of automobile dealer franchises under the New Motor Vehicle Board Act. (Veh. Code, § 3000 et seq.) BMW of North America, Inc. petitioned for a writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5, directing the respondent New Motor Vehicle Board of the State of California (Board) to vacate its decision allowing the protest of the establishment of a new dealer filed by real party in interest Hal Watkins Chevrolet, Inc., and to enter a new decision denying the protest. The trial court denied the petition and BMW appeals. BMW contends that the composition of the board is unconstitutional, that the Board lacks jurisdiction over the Watkins protest, and that the Board's interpretation of the relevant statutory provisions is constitutionally impermissible. We need not consider the constitutional questions raised because we conclude that as a matter of law the Board acted in excess of its jurisdiction in allowing the Watkins protest. We therefore reverse the judgment and remand to the trial court with directions to issue a writ of mandate.

### FACTS

Hal Watkins is the sole shareholder of Hal Sales, Inc. Hal Sales, Inc., in turn owns the majority of the stock in Hal Watkins Chevrolet, Inc. In 1974 Hal Watkins applied to become a franchised dealer for BMW automobiles. At that time Hoffman Motors Corporation was the North American importer of BMW automobiles. Hoffman accepted the application and entered into a franchise agreement with Watkins. Since that time two inconsequential changes have occurred. First, Hoffman Motors Corporation has been succeeded by plaintiff BMW of North America as the BMW importer for North America. Second, although the application was on behalf of Hal Sales, Inc., the actual franchise agreement is held on behalf of Hal Watkins Chevrolet, Inc.

The franchise agreements under which Watkins and BMW have operated have been limited-term contracts of one year with provision for renewal and

extension by BMW unless it acts to terminate the agreement in accordance with the contract provisions. Each succeeding agreement has an annual effective date of January 1. Each of the succeeding agreements contained a clause of which the 1982 agreement is typical: "BMWNA hereby appoints Dealer [Watkins] as a retail dealer of BMW Products and grants Dealer the nonexclusive right to buy BMW Products, all in accordance with, and subject to, the provisions of this Agreement. Dealer accepts such appointment and agrees to be bound by all of the terms and conditions of the Agreement. Dealer recognizes and agrees that its appointment as a Dealer in BMW Products does not confer upon it the exclusive right to deal in BMW Products in any specific geographic area. Nothing contained in the Agreement shall limit, or be construed to limit, the geographical area within which, or the persons to whom, Dealer may sell BMW Products. BMWNA reserves the right to grant or confer rights and privileges covering the sale and servicing of BMW Products upon such other Dealers selected and approved by BMWNA, whether located in Dealer's geographic area or elsewhere, as BMWNA, in its sole discretion, shall deem necessary or appropriate." The agreements have further provided: "No representative of BMWNA shall have authority to waive any of the provisions of the Agreement or to make any amendment or modification of or any other change in, addition to, or deletion of any portion of the Agreement . . . or which renews or extends the Agreement; unless such waiver, amendment, modification, change, addition, deletion, or agreement is made in writing and signed by BMWNA and Dealer as set forth in Article H of this Dealer Agreement."

Watkins opened Hal Watkins' BMW in Camarillo, in Ventura County. From time to time BMW had inquiries from other dealers, particularly Paul Rusnak, concerning the possibility of opening a franchise in the Thousand Oaks-Westlake area of Ventura County. Eventually, after a market study of the region, BMW determined to appoint Rusnak as a BMW dealer in the Thousand Oaks-Westlake area. Rusnak was to open his dealership in late 1982 or early 1983. Rusnak's franchise was to be located 15.2 miles from Watkins' Camarillo facility, and 16.2 miles from the next closest dealership in Canoga Park, Los Angeles County. BMW and Rusnak signed a letter of intent and Rusnak began preparations for the opening of his franchise.

Watkins filed a protest with the New Motor Vehicle Board, alleging that the appointment of Rusnak as a BMW dealer in Ventura County constituted a modification of his franchise agreement. After a lengthy administrative hearing the administrative law judge prepared a proposed decision in which he concluded that the appointment of Rusnak constituted a modification of Watkins' franchise agreement and that there was not good cause for the modification. In particular the administrative law judge found that BMW

failed to prove: (1) the amount of business transacted by Watkins is inadequate as compared to the business available; (2) the investment made and obligations incurred by Watkins was not substantial; (3) Watkins' investment was not permanent; (4) it would be beneficial to the public welfare for the franchise to be modified; (5) Watkins does not have adequate sales and service facilities or is not rendering adequate services; (6) Watkins failed to fulfill warranty obligations; and (7) Watkins failed to comply with the terms of the franchise. On January 12, 1983, the New Motor Vehicle Board adopted the proposed decision as its decision in the matter. This writ proceeding followed.

## Discussion

In 1967 the Legislature established the New Car Dealers Policy and Appeals Board to hear appeals of new car dealer licensing decisions of the Department of Motor Vehicles. (See Veh. Code, § 3000 et seq., added by Stats. 1967, ch. 1397, § 2, p. 3261 et seq.) At that time the duties of the Board were similar to those of other occupational licensing boards, and, as is common with such other boards, the Legislature mandated that four of the nine members be new car dealers. (Stats. 1967, ch. 1397, § 2, pp. 3261-3262.) In 1973 the Legislature changed the name of the Board to the New Motor Vehicle Board, and added sections 3060 to 3069 to the Vehicle Code. (Stats. 1973, ch. 996, § 16, pp. 1967-1971.) Among other things, those sections empower the Board to determine whether there is good cause for the termination, refusal to renew or continue, or the modification of an existing franchise agreement (Veh. Code, § 3060), and whether there is good cause not to relocate or establish a motor vehicle dealership in a relevant market area (Veh. Code, § 3062). In *American Motors Sales Corp. v. New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983, at pages 987 to 992 [138 Cal.Rptr. 594], this court held the requirement that four of the nine board members be new car dealers created a slanted adjudicatory tribunal and thus denied the manufacturer litigants procedural due process of law.

In reaction to the decision in *American Motors,* the Legislature amended Vehicle Code sections 3050 and 3066 to provide that the new car dealer members of the Board could not participate in, deliberate on, hear or consider, or decide any matter involving a dispute between a manufacturer and a dealer. (Stats. 1977, ch. 278, §§ 2-3, pp. 1171-1173.) In 1979 the Legislature enacted urgency legislation to provide that the new motor vehicle dealer members of the Board "may participate in, hear, and comment or advise other members upon, but may not decide," any dispute between a dealer and a manufacturer. (Stats. 1979, ch. 340, §§ 1-2, pp. 1206-1207.)

The stated urgency for the legislation was so that the "educated and needed advice of New Motor Vehicle Board members who are themselves new motor vehicle dealers may be utilized in the decision making process of the board . . . ." (Stats. 1979, ch. 340, § 3, p. 1207.)

After the trial court's decision in this case, the Court of Appeal for the First District held in *Chevrolet Motor Division* v. *New Motor Vehicle Bd.* (1983) 146 Cal.App.3d 533, at page 541 [194 Cal.Rptr. 270], that the mere fact the new motor vehicle dealer members of the board do not technically decide the issues does not cure the constitutional problem of submitting disputes to a biased tribunal, and hence the statutory procedure remains constitutionally defective. In *Nissan Motor Corp.* v. *New Motor Vehicle Bd.* (1984) 153 Cal.App.3d 109, at page 115 [202 Cal.Rptr. 1], another division of the same court agreed with the holding in *Chevrolet Motor Division.*

The parties renew the dispute whether the procedural provisions for the adjudication of dealer protests before the New Motor Vehicle Board satisfy the requirements of due process and, if not, whether recusal of the new motor vehicle dealer members of the Board from participation in the decision cures any deficiency in the legislation. BMW additionally contends that the Board's construction of the relevant statutory provisions was itself unconstitutional. We are urged by BMW to follow *Chevrolet Motor Division* and declare the composition of the Board to be unconstitutionally biased in violation of due process of law. Watkins argues that both the *Chevrolet Motor Division* case, and our decision in *American Motors* upon which it relies, conflict with various federal decisions and with the opinion of the California Supreme Court in *Andrews* v. *Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781 [171 Cal.Rptr. 590, 623 P.2d 151].[1] In essence, Watkins contends that the asserted economic interest of dealer board members is too speculative, contingent and uncertain to rise to the level of bias which would deprive manufacturers of a fair and impartial hearing. In resolving this dispute we need not, and therefore do not, reach the constitutional questions raised. We conclude instead that as a matter of law the Board acted in excess of its jurisdiction and erred in allowing the Hal Watkins protest.

---

[1]*Andrews* involved the denial of a motion to disqualify a temporary administrative law officer in an unfair labor practices hearing. The ground for bias was the officer's practice of law with a firm which had previously represented farm workers in a suit against the Secretary of Labor and which had engaged in employment discrimination suits on behalf of Mexican-Americans. Holding that the hearing officer did not err in refusing to disqualify himself, the court noted that the "right to an impartial trier of fact is not synonymous with the claimed right to a trier completely indifferent to the general subject matter of the claim before him." (*Andrews* v. *Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 790 [171 Cal.Rptr. 590, 623 P.2d 151].)

■ There can be no question that the relationship between automobile manufacturers and retail dealers is a relationship that is subject to governmental regulation. In *New Motor Vehicle Bd.* v. *Orrin W. Fox Co.* (1978) 439 U.S. 96 [58 L.Ed.2d 361, 99 S.Ct. 403], the United States Supreme Court considered whether California could, by rule or statute, temporarily delay the establishment or relocation of an automobile dealership pending the adjudication of an existing dealer's protest. The Court concluded that a state may constitutionally require the manufacturer to secure regulatory approval before engaging in specified practices. (439 U.S. at p. 108 [58 L.Ed.2d at p. 374].) The California Legislature, the high court found, "was empowered to subordinate the franchise rights of automobile manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices." (*Id.*, at p. 107 [58 L.Ed.2d at pp. 374, 376].)[2]

The provisions of California's regulatory scheme involved here are contained in Vehicle Code sections 3060 through 3063, which are set out in full in the margin.[3] The first portion of section 3060 precludes a franchisor

---

[2]The decision in *Fox* did not settle all questions of the constitutionality of the regulatory scheme. That decision only addressed the "narrow question . . . whether California may, by rule or statute, temporarily delay the establishment or relocation of automobile dealerships pending the Board's adjudication of the protests of existing dealers." (439 U.S. at p. 106 [58 L.Ed.2d at p. 373].) The Court decided that regulation is permissible, but in doing so expressly noted that California's regulatory scheme was clearly articulated and affirmatively expressed, and that disputes were to be determined by an impartial tribunal. (*Id.*, at pp. 107-108, 109 [58 L.Ed.2d at pp. 374, 376].) Different questions are raised where, as is alleged here, the Legislature has since acted to create a biased rather than impartial tribunal, and the tribunal acts in a manner which is not pursuant to clearly articulated and affirmatively expressed statutory or regulatory provisions.

[3]Unless otherwise indicated, all further statutory references are to Vehicle Code.

Section 3060 provides: "Notwithstanding the terms of any franchise, no franchisor shall terminate or refuse to continue any existing franchise unless: [¶] (a) The franchisee and the board have received written notice from the franchisor as follows: [¶] (1) Sixty days before the effective date thereof setting forth the specific grounds for termination or refusal to continue. [¶] (2) Fifteen days before the effective date thereof setting forth the specific grounds with respect to any of the following: [¶] (A) Transfer of any ownership or interest in the franchise without the consent of the franchisor, which consent shall not be unreasonably withheld. [¶] (B) Misrepresentation by the franchisee in applying for the franchise. [¶] (C) Insolvency of the franchisee, or filing of any petition by or against the franchisee under any bankruptcy or receivership law. [¶] (D) Any unfair business practice after written warning thereof. [¶] (E) Failure of the motor vehicle dealer to conduct its customary sales and service operations during its customary hours of business for seven consecutive business days, giving rise to a good faith belief on the part of the franchisor that the motor vehicle dealer is in fact going out of business, except for circumstances beyond the direct control of the motor vehicle dealer or by order of the department. [¶] (3) The written notice shall contain, on the first page thereof, a conspicuous statement which reads as follows: 'NOTICE TO DEALER: You may be entitled to file a protest with the NEW MOTOR VEHICLE BOARD in Sacramento and have a hearing on your protest under the terms of the California Vehicle Code if you oppose this action. It is important that you act promptly.' [¶] (b) The board finds that there is good cause for termination or refusal to continue, following a

from terminating or refusing to continue an existing franchise without compliance with certain procedural provisions and, if a protest is filed, unless

hearing called pursuant to Section 3066. The franchisee may file a protest with the board within 30 days after receiving a 60-day notice or within 10 days after receiving a 15-day notice. When a protest is filed, the board shall advise the franchisor that a timely protest has been filed, that a hearing is required pursuant to Section 3066, and that the franchisor may not terminate or refuse to continue until the board makes its findings. [¶] (c) The franchisor has received the written consent of the franchisee, or the appropriate period for filing a protest has elapsed. [¶] The franchisor shall not modify or replace a franchise with a succeeding franchise if the modification or replacement would substantially affect the franchisee's sales or service obligations or investment, unless the franchisor has first given the board and each affected franchisee notice thereof at least 60 days in advance of the modification or replacement. Within 30 days of receipt of the notice, a franchisee may file a protest with the board and the modification or replacement does not become effective until there is a finding by the board that there is good cause for the modification or replacement. If, however, a replacement franchise is the successor franchise to an expiring or expired term franchise, the prior franchise shall continue in effect until resolution of the protest by the board. In the event of multiple protests, hearings shall be consolidated to expedite the disposition of the issue."

Section 3061 provides: "In determining whether good cause has been established for modifying, replacing, terminating, or refusing to continue a franchise, the board shall take into consideration the existing circumstances, including, but not limited to, all of the following: [¶] (a) Amount of business transacted by the franchisee, as compared to the business available to the franchisee. [¶] (b) Investment necessarily made and obligations incurred by the franchisee to perform its part of the franchise. [¶] (c) Permanency of the investment. [¶] (d) Whether it is injurious or beneficial to the public welfare for the franchise to be modified or replaced or the business of the franchisee disrupted. [¶] (e) Whether the franchisee has adequate motor vehicle sales and service facilities, equipment, vehicle parts, and qualified service personnel to reasonably provide for the needs of the consumers for the motor vehicles handled by the franchisee and has been and is rendering adequate services to the public. [¶] (f) Whether the franchisee fails to fulfill the warranty obligations of the franchisor to be performed by the franchisee. [¶] (g) Extent of franchisee's failure to comply with the terms of the franchise."

Section 3062 provides: "(a) Except as otherwise provided in subdivision (b), in the event that a franchisor seeks to enter into a franchise establishing an additional motor vehicle dealership within a relevant market area where the same line-make is then represented, or relocating an existing motor vehicle dealership, the franchisor shall in writing first notify the board and each franchisee in that line-make in the relevant market area of the franchisor's intention to establish an additional dealership or to relocate an existing dealership within or into that market area. Within 20 days of receiving that notice or within 20 days after the end of any appeal procedure provided by the franchisor, any such franchisee may file with the board a protest to the establishing or relocating of the dealership. If within this time a franchisee files with the board a request for additional time to file a protest, the board or its secretary, upon a showing of good cause, may grant an additional 10 days to file the protest. When such a protest is filed, the board shall inform the franchisor that a timely protest has been filed, that a hearing is required pursuant to Section 3066, and that the franchisor shall not establish or relocate the proposed dealership until the board has held a hearing as provided in Section 3066, nor thereafter, if the board has determined that there is good cause for not permitting the dealership. In the event of multiple protests, hearings may be consolidated to expedite the disposition of the issue. [¶] For the purposes of this section, the reopening in a relevant market area of a dealership that has not been in operation for one year or more shall be deemed the establishment of an additional motor vehicle dealership. [¶] (b) With respect to the relocation of an existing dealership, subdivision (a) does not apply to any relocation which is less than one mile from the existing location of the deal-

the Board finds that there is good cause for the termination or refusal to continue. The second portion of section 3060 precludes a franchisor from modifying or replacing a franchise with a succeeding franchise if the modification or replacement would substantially affect the franchisee's sales or service obligations or investment, unless the franchisor complies with certain procedural provisions and in the event of a protest the Board finds good cause for the modification or replacement. Section 3061 provides the factors to be considered by the Board in determining whether good cause has been established for modifying, replacing, terminating, or refusing to continue a franchise.

Section 3062 limits the ability of a franchisor to establish or relocate a dealership within an area where the same line-make is already represented. In doing so the section utilizes the term "relevant market area" which is in turn defined in section 507 as being "any area within a radius of 10 miles from the site of a potential new dealership." Thus under section 3062, any franchisee within 10 miles of the site of a proposed new or relocated dealership of the same line-make may protest such proposed action. At the hearing on the protest the question is whether the existing franchisee establishes good cause for not allowing the establishment or relocation of the additional dealer within the relevant market area, and section 3063 sets forth the factors which are to be considered by the Board.

Watkins concedes, as he must, that he was not entitled to file a protest of the establishment of the Thousand Oaks-Westlake BMW dealer under section 3062. That proposed dealership was more than 15 miles from Watkins' Camarillo dealership and thus Watkins is well outside the relevant market area. At the hearing on the protest Watkins specifically disclaimed any intent to proceed under section 3062. Instead, Watkins claims that the establishment of a new dealership within Ventura County would constitute a modi-

ership and which is to a location within the same relevant market area within the same city where the existing dealership is located. [¶] (c) Subdivision (a) does not apply to the establishment of a branch office for selling vehicles at a fair, exposition, or similar exhibit that does not exceed 30 days."

Section 3063 provides: "In determining whether good cause has been established for not entering into or relocating an additional franchise for the same line-make, the board shall take into consideration the existing circumstances, including, but not limited to, all of the following: [¶] (a) Permanency of the investment. [¶] (b) Effect on the retail motor vehicle business and the consuming public in the relevant market area. [¶] (c) Whether it is injurious to the public welfare for an additional franchise to be established. [¶] (d) Whether the franchisees of the same line-make in that relevant market area are providing adequate competition and convenient consumer care for the motor vehicles of the line-make in the market area which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of vehicle parts, and qualified service personnel. [¶] (e) Whether the establishment of an additional franchise would increase competition and therefore be in the public interest."

fication of his franchise. The Board agreed with this contention. In doing so it erred.

■ Although a franchise is technically a grant of power by a governmental entity to a private person or entity, with respect to the automotive industry a franchise has been defined as "an agreement between two private entities arising out of the 'general right to engage in a lawful business, part of the liberty of the citizen.'" (*National Labor Relations Board* v. *Bill Daniels, Inc.* (6th Cir. 1953) 202 F.2d 579, 582, citation omitted.) This definition is consistent with the California Vehicle Code, which defines a franchise as a "written agreement between two or more persons" relating to the sale and distribution of automotive products. (§ 331.) A "franchise" within the meaning of the Vehicle Code is thus a contract, and as such is subject to the normal rules relating to contracts.

■ The parol evidence rule is a fundamental rule of contract law which operates to bar extrinsic evidence contradicting the terms of a written contract. (*Riley* v. *Bear Creek Planning Committee* (1976) 17 Cal.3d 500, 508-509 [131 Cal.Rptr. 381, 551 P.2d 1213].) It is not merely a rule of evidence but is substantive in scope. (*Estate of Gaines* (1940) 15 Cal.2d 255, 264-265 [100 P.2d 1055]; see also Witkin, Cal. Evidence (2d ed. 1966) Documentary Evidence, § 715, pp. 661-662; 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Parol Evidence Rule, § 32.1, pp. 1121-1123.) Under that rule the act of executing a written contract, whether required by law to be in writing or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument. (Civ. Code, § 1625.) Extrinsic evidence cannot be admitted to prove what the agreement was, not for any of the usual reasons for exclusion of evidence, but because as a matter of law the agreement is the writing itself. (*Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11, 22-23 [92 Cal.Rptr. 704, 480 P.2d 320].) Consequently, "in determining whether substantial evidence supports a judgment, extrinsic evidence inconsistent with any interpretation to which the instrument is reasonably susceptible becomes irrelevant; as a matter of substantive law such evidence cannot serve to create or alter the obligations under the instrument. Irrelevant evidence cannot support a judgment." ■ ■ ■ ■ (*Ibid.*, citations and footnotes omitted.)[4]

---

[4]Two aspects of the parol evidence rule should be noted here. First, where the written contract is not an integration, that is, the complete and final agreement of the parties, then evidence of a separate oral agreement may be introduced as to any matter on which the agreement is silent and which is not inconsistent with its written terms. (See *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 226-228 [65 Cal.Rptr. 545, 436 P.2d 561].) Second, extrinsic evidence may be introduced to explain the meaning of a written contract and the test for admissibility is whether the meaning urged is one to which the written contract terms are

In determining the rights and liabilities of BMW and Watkins under the franchise agreement the first reference must be to the written terms of the contract. That agreement clearly and unequivocally provides that Watkins was not granted the exclusive right to deal in BMW products in any particular geographic area and was not limited in the area in which he could trade. BMW expressly reserved the right to appoint other dealers in BMW products, whether located in Watkins' geographic area or not. This contract language, of course, cannot be reasonably construed to provide Watkins with the exclusive right to sell BMW products in Ventura County, or in any geographical area, and cannot be construed to give him the right to object to the appointment of a new dealer 15.2 miles from the site of his dealership. Accordingly, in determining to appoint a new dealer in the Thousand Oaks-Westlake area, BMW was acting pursuant to, rather than in derogation of, Watkins' franchise agreement.

Watkins asserted, and the trial court agreed, that the reservation in the franchise agreement of the right to appoint additional dealers is "contrary to the public policy expressed in the Act, and thus void." We disagree. By virtue of section 3060, a franchisor may be required to continue existing franchise agreements without modification if a modification would substantially affect the franchisee's sales and service obligations or investment. However, that section in no manner dictates what must be included in a franchise agreement, and it does not state or imply that a franchisor may not reserve the power to appoint new dealers or that a franchise must provide an exclusive trading area to the dealer. The provision of the Act dealing with the appointment of new dealers is found in section 3062, and it specifically limits the right of an existing franchisee to object to the appointment of a new dealer to a 10-mile radius. That section not only restricts the right of a franchisee to object to the appointment of a new dealer to the 10-mile radius, but it also implicitly recognizes the right of a franchisor to appoint new dealers, subject of course to the right of an existing dealer to show good cause for precluding such appointment if it is to be within 10 miles of the existing dealer. Thus, neither the reservation of the right to appoint new dealers, nor the proposed appointment of a dealer over 15 miles from Watkins' dealership, is contrary to the public policy expressed in sections 3060 and 3062.

The trial court stated that it would alternatively find that the proposed appointment of a new dealer would constitute a modification of Watkins'

reasonably susceptible. (See *Pacific Gas & E. Co.* v. *G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) As we explain, neither of these aspects of the rule is involved here since the meaning urged by Watkins is directly contrary to the express written terms of his contract.

franchise by changing his A.O.R. A.O.R. stands for area of responsibility, and this concept may be briefly explained. Essentially, for internal planning purposes, BMW utilizes data from R. L. Polk, Inc., which in turn reports annual new car registrations by post office zip code. Among other things, this information enables BMW to determine whether it is achieving sufficient market penetration in any particular area. For example, BMW regards its competition as including Porsche-Audi, Mercedes Benz, and Volvo. During 1981, in the district of which Watkins is a part, BMW maintained a 13.1 percent share of this combined market. In contrast, in the Thousand Oaks-Westlake area BMW obtained only 8.6 percent of that market. This indicated that in the Thousand Oaks-Westlake area BMW was doing very poorly against its competition and this was one of the reasons BMW determined to appoint a dealer in that area.

Another purpose for which the Polk data may be used is the estimation of required service and parts facilities. From this data BMW derives a figure known as the U.I.O., an abbreviation of units in operation. The U.I.O. figure is derived from a study of past registration figures together with projected sales levels. The number of units in operation in proximity to a dealer's location is one of the factors which BMW considers in determining the levels of service and parts facilities a dealer should maintain to provide adequately for the demand for services and parts. It is not, however, the only factor considered.

As we have noted, BMW utilizes the A.O.R. concept for some internal planning purposes. Under this concept every geographic area denominated by a zip code is assigned to an A.O.R. for an existing dealer. The total group of zip code areas assigned to a particular dealer is that dealer's A.O.R. By design, these areas of responsibility throughout the United States are contiguous. For this reason the size of a particular A.O.R. is dependent upon the distance between BMW dealers. Where the distances between dealers are vast, the A.O.R.'s involved are correspondingly vast; where the distances between dealers are small, the A.O.R.'s are also small. Since all geographic areas in the country are included within some A.O.R., it follows that the appointment of a new dealer will necessarily alter the A.O.R.'s of the nearest dealers. Indeed, BMW concedes that the A.O.R. for the new Thousand Oaks-Westlake dealer will include areas which were previously within the A.O.R.'s of Watkins in Camarillo and Bob Smith in Canoga Park.

The Board and the trial court erred in concluding that a change in Watkins' A.O.R. constituted a modification of his franchise agreement. The A.O.R. concept, as we have explained, is an entirely internal planning

mechanism utilized by BMW, and is only one of many such mechanisms. BMW is free to use whatever planning mechanisms it desires in determining how to market its products. But these internal considerations are not relevant and are not admissible to establish a meaning of a written contract where the written contract is not reasonably susceptible of the meaning urged. (See *Blumenfeld* v. *R. H. Macy & Co.* (1979) 92 Cal.App.3d 38, 44-45 [154 Cal.Rptr. 652].) Watkins' franchise agreement does not refer at all to an A.O.R. or to U.I.O.'s. The agreement does not suggest that Watkins' right to market BMW products is to be in any manner exclusive in any geographical area. In fact it states just the opposite, namely that it is not exclusive and that BMW reserves the right to appoint other dealers whether in Watkins' geographic area or not. The decision of the Board disregarded the terms of Watkins' franchise agreement and imposed contractual obligations upon BMW to which it had never consented and which no interpretation of the contract could support. In short, the fact that BMW utilizes the A.O.R. concept for internal planning purposes does not give Watkins any exclusive right within his A.O.R.

From this discussion it is apparent that in precluding BMW from appointing a dealer in the Thousand Oaks-Westlake area the Board acted in excess of its jurisdiction. The Legislature has acted to regulate the relationship between franchisors and franchisees in the automobile industry, but has done so in a limited manner pursuant to clearly articulated and specifically expressed principles. Those principles provide that a franchisor may be required to continue unmodified an existing franchise agreement, or may be precluded from establishing or relocating a dealer within 10 miles of an existing dealer. Beyond those two qualifications (and others not relevant here) the Board has been given no power to regulate the relationship between franchisors and franchisees, and with those exceptions the rule is still unfettered competition and freedom of contract. In precluding BMW from establishing the Thousand Oaks-Westlake dealer the Board disregarded rather than enforced the franchise contract between Watkins and BMW, and gave Watkins something that neither his contract nor the act gave him, namely, an exclusive trading territory far in excess of his relevant market area.

In sum, by the nature of BMW's internal planning formula, the creation of any new dealership would necessarily change the A.O.R. of some existing dealer and hence also the units in operation in his zone. If Watkins' position were sustained, BMW could never create a new dealership without establishing good cause before the Board. The result would be that existing BMW dealers, like Watkins, in contravention of the express terms of their franchises, would be accorded a perpetual territorial monopoly. The short

answer is that the appointment of a new dealer does not change a single provision of Watkins' franchise and consequently cannot constitute a modification. The power of the Board arises under the statute only when franchisor improperly "terminate[s] or refuse[s] to continue any existing franchise" or impermissibly "modif[ies] or replace[s] a franchise with a succeeding franchise." (§ 3060.) None of the statutory predicates occurred here. Instead, in violation of the parol evidence rule, Watkins and the Board would rewrite the franchise to read that BMW reserves the right to create other dealers in the present dealer's geographic area, "provided that the new dealership does not change the area of responsibility or units in operation." Having rewritten the agreement, the Board then finds that BMW modified the recast franchise without good cause. Because there was no competent evidentiary basis for that finding and because the Board has no general power over franchises absent statutory enablement, the Board exceeded its jurisdiction. ■ It is fundamental that an administrative agency has only such power as has been conferred upon it by the constitution or by statute and an act in excess of the power conferred upon the agency is void. (See *Ferdig* v. *State Personnel Bd.* (1969) 71 Cal.2d 96, 103-104 [77 Cal.Rptr. 224, 453 P.2d 728]; *California State Restaurant Assn.* v. *Whitlow* (1976) 58 Cal.App.3d 340, 346-347 [129 Cal.Rptr. 824].) A writ of administrative mandate will lie to correct acts in excess of jurisdiction. (Code Civ. Proc., § 1094.5, subd. (b).) ■ Accordingly, the trial court erred in denying the petition of BMW for a writ of mandate.

The judgment of the trial court is reversed and the cause is remanded to the trial court with directions to issue a peremptory writ of mandate directing the respondent New Motor Vehicle Board to vacate its decision granting the protest of Hal Watkins Chevrolet, Inc. doing business as Hal Watkins BMW, and to issue a new decision denying said protest.

Puglia, P. J., and Carr, J., concurred.

Petitions for a rehearing were denied January 14, 1985, and the petitions of all respondents for a hearing by the Supreme Court were denied March 13, 1985.