[No. B099982. Second Dist., Div. Three. Aug. 29, 1997.]

CHRISTY TOVAS, as Co-trustee, etc., et al., Plaintiffs and Appellants, v. AMERICAN HONDA MOTOR COMPANY, INC., et al., Defendants and Respondents.

## COUNSEL

Bishton-Gubernick, Norris J. Bishton, Jr., and Jeffrey S. Gubernick for Plaintiffs and Appellants. .

O'Melveny & Myers, Wallace M. Allan and Gregory R. Oxford for Defendants and Respondents.

## OPINION

## KITCHING, J.—

### INTRODUCTION

In this case we are asked to decide whether the New Motor Vehicle Board (Board) has jurisdiction under Vehicle Code section 3050, subdivision (c), to consider allegations of serious financial misconduct asserted by plaintiffs against American Honda Motor Company, Inc.[1] We find that section 3050, subdivision (c) does not provide the Board with jurisdiction. A cause of action for contractual interference based on tortious business practices independent of any franchise agreement, brought by a nonsignatory to a franchise agreement with Honda, is not the type of claim over which section 3050 gives the Board jurisdiction.

The heirs and ex-wife of decedent Robert L. Hix (collectively referred to as the Hix heirs) brought an action against American Honda Motor Company, Inc. and Honda North American, Inc. (collectively referred to as Honda) alleging that Honda's misconduct, stemming from an alleged commercial bribery scheme, constituted intentional interference with the purchase agreements between Robert Hix (Hix) and a Honda dealership. Hix

---

[1]Unless otherwise indicated, all statutory references are to the Vehicle Code.

had no contractual arrangement with Honda. The trial court ruled that under the *"Yamaha"* line of cases,[2] the Board had jurisdiction over the claim and the Hix heirs were first required to exhaust their administrative remedy before the Board prior to filing the lawsuit. The court then entered judgment on the pleadings in favor of Honda, and dismissed the complaint. The Hix heirs appealed.

We find that the scope of the Board's jurisdiction is limited by the legislative authority granted under section 3050, subdivision (c), and the nature of the aggrieved party's claim. The Board exercises jurisdiction only over "any matter" or dispute specifically enumerated by section 3050. This is because the Board's specialized expertise and familiarity with issues affecting vehicle franchise relationships expedites resolution of these disputes. (See *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 87-88 [276 Cal.Rptr. 130, 801 P.2d 373]; *Miller* v. *Superior Court* (1996) 50 Cal.App.4th 1665, 1676-1677 [58 Cal.Rptr.2d 584].) We cannot expand the jurisdiction of the Board beyond the statutory authority granted by the Legislature.

The alleged bribery scheme asserted by the Hix heirs, however, is not the type of conduct regulated or proscribed by section 3050, or the type of conduct over which the Board has any specialized knowledge, familiarity, or expertise. Therefore, an administrative hearing before the Board is neither necessary nor required. Furthermore, we agree with the recent decisions of *Hardin Oldsmobile* v. *New Motor Vehicle Bd.* (1997) 52 Cal.App.4th 585 [60 Cal.Rptr.2d 583] and *Miller* v. *Superior Court, supra,* 50 Cal.App.4th 1665, and find their analysis of the Board's limited authority to be persuasive.

Accordingly, we determine that the Hix heirs' common law tort claim of contractual interference arose from independent allegations of Honda's tortious business practices. As such, the claim is beyond the scope of section 3050, subdivision (c) and the Board's jurisdiction. The Hix heirs are not required to exhaust any administrative remedies, and their claim is properly before the trial court. The judgment of dismissal is reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

This action arises from assertions of misconduct committed by Honda.

According to the factual allegations in the amended complaint, sometime prior to 1985 Hix obtained a right of first refusal to purchase Herb Friedlander Honda, an authorized Honda dealership. In February 1985, Hix

[2]*Yamaha Motor Corp.* v. *Superior Court* (1986) 185 Cal.App.3d 1232 [230 Cal.Rptr. 382] (*Yamaha I*); *Yamaha Motor Corp.* v. *Superior Court* (1987) 195 Cal.App.3d 652 [240 Cal.Rptr. 806] (*Yamaha II*); *Mathew Zaheri Corp.* v. *Mitsubishi Motor Sales* (1993) 17 Cal.App.4th 288 [21 Cal.Rptr.2d 325].

entered into a buy/sell agreement with Herb Friedlander (Friedlander) to purchase the dealership. The sale agreement required Honda's approval.[3] In April 1985, Hix entered into an agreement with the Garden Grove Agency for Community Development to acquire a site for the Honda dealership in the Garden Grove Auto Center. Honda preferred that the dealership be relocated to this auto center.[4] Without providing a reason, Honda subsequently refused to approve Hix's agreement with Friedlander. Hix's right to purchase a site in the Garden Grove Auto Center expired.

In April 1986, Friedlander notified Hix of the proposed sale of the dealership to Martin Lustgarten (Lustgarten), a principal of the Martin Automotive Group. He offered Hix the opportunity to exercise his right of first refusal. The proposed Lustgarten agreement, while $500,000 less than the Hix offer, included as a material term the transfer to Friedlander of a letter of intent from Honda awarding Lustgarten a new Acura franchise in San Bernardino. The letter of intent, together with Honda's consent to the assignment of the letter, had become conditions of the sale. Hix unsuccessfully attempted to obtain from Honda a letter of intent to transfer to Friedlander, and was therefore unable to exercise his first refusal right.[5] Lustgarten purchased the Friedlander dealership. In 1988, Hix died.

After Hix's failed purchase attempt, Friedlander's attorney informed Hix's family that Lustgarten was being investigated in connection with criminal

[3]The automotive dealer service and sales agreement between Honda and Friedlander provided, in relevant part: "[Article] 8.1. . . . No change affecting such involvement, ownership or management will be made without prior written approval of American Honda, which approval will not be unreasonably withheld."

[4]On September 6, 1985, Bob Rivers, Honda's western zone sales manager, wrote to John Graichen, Garden Grove general manager of development: "We have been notified by Mr. Herb Friedlander, Herb Friedlander Honda, of his current negotiations to sell his Honda automobile dealership to Mr. Robert Hix. [¶] I would like to inform you that if this Buy/Sell is consummated, our preference would be to relocate the dealership to the Garden Grove Auto Mall."

[5]In a May 6, 1996, letter to Friedlander's attorney, Hix's counsel stated: "As I indicated to you in our telephone conversation, I represent Robert L. Hix, to whom you submitted a Notice of Terms of Sale in connection with his right of first refusal to purchase the assets of Herb Freidlander Auto Sales. [¶] You indicated to me in our telephone conversation that the condition contained in paragraph 5B(1) that the buyer obtain a binding letter of intent concerning the operation of a franchise for the sale and service of Acura motor vehicles in or around the City of San Bernardino, California area and a consent to the assignment of the letter of intent to Mr. Friedlander by American Honda Motor Company has been met by the purchaser. This is a condition that could not be met by Mr. Hix, so he is unable to exercise his right of first refusal. [¶] If the transaction fails to close in accordance with the terms and conditions submitted to Mr. Hix, please resubmit the transaction to him so that he might have an opportunity to exercise his right of first refusal. If the present proposed buyer fails to close entirely, please submit any proposed future sales to Mr. Hix in accordance with the provisions contained in the right of first refusal."

conduct by former Honda executives who had accepted valuable consideration in exchange for awarding franchises and giving preferential treatment to certain prospective dealers. Lustgarten had allegedly acquired numerous Honda dealerships, including the Friedlander dealership, by paying large sums of money to various Honda officials to obtain the manufacturer's required approval for the purchase. Furthermore, Honda ordered the Friedlander dealership be sold to Lustgarten and set the purchase price.

On April 5, 1995, the Hix heirs filed a complaint against Honda. In an amended complaint for intentional interference with contractual relations, the heirs alleged that Honda's wrongful business practices and the fraudulent transaction with Friedlander and Lustgarten resulted in Hix's loss of the dealership.

On September 19, 1995, Honda moved for judgment on the pleadings on the ground that the trial court lacked jurisdiction to hear the claim because the Hix heirs had failed to exhaust their administrative remedies before the Board. Honda contended that the interference claim alleged a violation of the Vehicle Code based on Honda's refusal to consent to the sale of the dealership, and that under the *Yamaha* line of cases, the interference claim was subject to the jurisdiction of the Board. In opposition, the Hix heirs argued that the claim did not involve a controversy arising from an existing franchise agreement and was beyond the scope of section 3050, subdivision (c), and the Board's jurisdiction.

On October 27, 1995, the trial court granted Honda's motion.[6] On December 7, 1995, judgment was entered and the complaint was dismissed.

The Hix heirs timely filed a notice of appeal.

DISCUSSION

*The Common Law Claim for Contractual Interference Is Beyond the Scope of Section 3050, Subdivision (c), and the Jurisdiction of the Board.*

The Hix heirs contend that the trial court erred in finding they were required to exhaust administrative remedies before filing the civil action

---

[6]The judgment read, in relevant part: "1. Pursuant to sections 438(c)(3)(B)(i) and 438(h)(3) of the Code of Civil Procedure, plaintiffs' complaint is dismissed for lack of jurisdiction because plaintiffs have failed to exhaust available administrative remedies before the New Motor Vehicle Board of the State of California. *See* Cal. Veh. Code §§ 3050(c), 11713.3(d), (e); 13 Cal Code Regs. §§ 554 *et seq.*; *Yamaha Motor Corp., U.S.A.* v. *Superior Court*, 195 Cal.App.3d 652 [240 Cal.Rptr. 806] (1987)."

against Honda. They specifically argue that the interference claim is beyond the Board's jurisdiction because it is premised not on Honda's refusal to consent to Friedlander's sale of the dealership to Hix, but on Honda's independent liability for illegal acts that adversely affected Hix's sales agreements with Friedlander. We agree.

1. *Legislative History and Statutory Scheme*

a. *Legislative History*

■ The franchise relationship between automobile manufacturers and their retail dealers is subject to governmental regulation. (*BMW of North America, Inc.* v. *New Motor Vehicle Bd.* (1984) 162 Cal.App.3d 980, 987 [209 Cal.Rptr. 50]; see § 3000 et seq.) In 1967, the Legislature adopted sections 3000 and 3050 which created the New Car Dealers Policy and Appeals Board. (*American Motors Sales Corp.* v. *New Motor Vehicle Bd.* (1977) 69 Cal.App.3d 983, 986 [138 Cal.Rptr. 594].) This board was "originally empowered to handle licensing of new automobile retail dealerships and to review decisions of the Department of Motor Vehicles disciplining dealers." (*New Motor Vehicle Bd.* v. *Orin W. Fox Co.* (1978) 439 U.S. 96, 102, fn. 6 [99 S.Ct. 403, 408, 58 L.Ed.2d 361].) The board's functions were "1. To prescribe rules and regulations relating to the licensing of new car dealers; [¶] 2. To hear and consider, within certain limitations, an appeal by an applicant for or the holder of a license as a new car dealer from an action or decision by the Department of Motor Vehicles; and [¶] 3. To consider any other matter concerning the activities or practices of applicants for or holders of licenses as new car dealers. [Citation.]" (*American Motors Sales Corp.* v. *New Motor Vehicle Bd.*, *supra*, 69 Cal.App.3d at p. 986, fn. 3.)

In 1973, the Legislature renamed the New Car Dealers Policy and Appeals Board the New Motor Vehicle Board and expanded the Board's authority by adding sections 3060 to 3065.[7] (*University Ford Chrysler-Plymouth, Inc.* v. *New Motor Vehicle Bd.* (1986) 179 Cal.App.3d 796, 800 [224 Cal.Rptr.

---

[7]Section 3000 provides that "[t]here is in the Department of Motor Vehicles a New Motor Vehicle Board, which consists of nine members."

"Sections 1, 39, of Stats. 1973, c. 996, p. 1964, provided:

"Section 1. The Legislature finds and declares that the distribution and sale of new motor vehicles in the State of California vitally affects the general economy of the state and the public welfare and that in order to promote the public welfare and in the exercise of its police power, it is necessary to regulate and to license vehicle dealers, manufacturers, manufacturer branches, distributors, distributor branches, and representatives of vehicle manufacturers and distributors doing business in California in order to avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor and to insure that dealers fulfill their obligations under their franchises and provide adequate and sufficient service to

908]; *American Motors Sales Corp.* v. *New Motor Vehicle Bd., supra,* 69 Cal.App.3d at p. 986.) These code sections empowered the Board to resolve disputes involving "(1) whether there is 'good cause' to terminate or to refuse to continue a franchise (§ 3060); (2) whether there is 'good cause' not to establish or relocate a motor vehicle dealership in a 'relevant market area' (§ 3062); (3) delivery and preparation obligations (§ 3064); and (4) warranty reimbursement (§ 3065)." (69 Cal.App.3d at pp. 986-987.) Thus, the Board no longer only sat "in judgment upon new car dealers in such matters as eligibility and qualification for a license, regulation of practices, discipline for rule violations, and the like. [The additional statutes gave the Board] the added power to intrude upon the contractual rights and obligations of dealers and their product suppliers, entities whose respective economic interests are in no way identical or coextensive, frequently not even harmonious." (*Id.* at p. 991.)

With this history in mind, we examine the scope of the Board's authority within the relevant statutory framework of the Vehicle Code, and the position of the parties.

### b. *Statutory Scheme*

As explained, the Legislature created this "statutory scheme to regulate the franchise relationship between vehicle manufacturers and dealers. [Citations.]" (*Yamaha II, supra,* 195 Cal.App.3d at p. 656.) The Board adjudicates certain claims between these two entities.

### (1) *Authority of Board*

The duties and the authority of the Board are embodied in section 3050. Section 3050, subdivision (c) allows the Board to consider *"any matter"* concerning a new motor vehicle manufacturer or dealer. An issue in this appeal is the scope of subdivision (c) as defined by the term "any matter."

Section 3050, provides that the Board shall:

"(a) Adopt rules and regulations . . . governing such matters as are specifically committed to its jurisdiction.

"(b) Hear and consider, . . . an appeal presented by an applicant for, or holder of, a license as a new motor vehicle dealer, manufacturer,

consumers generally." (Historical Note, 65B West's Ann. Veh. Code (1987 ed.) § 3000, p. 263.)

manufacturer branch, distributor, distributor branch, or representative when the applicant or licensee submits an appeal provided for in this chapter from a decision arising out of the [Department of Motor Vehicles].

"(c) Consider *any matter* concerning the activities or practices of any person applying for or holding a license as a new motor vehicle dealer, manufacturer, manufacturer branch, distributor, distributor branch, or representative pursuant to Chapter 4 (commencing with Section 11700) of Division 5 submitted by any person. A member of the board who is a new motor vehicle dealer may not participate in, hear, comment, advise the members upon, or decide any matter considered by the board pursuant to this subdivision that involves a dispute between a franchisee and franchisor. After such consideration, the board may do any one or any combination of the following:

"(1) Direct the department to conduct investigation of matters that the board deems reasonable, and make a written report on the results of the investigation to the board within the time frame specified by the board.

"(2) Undertake to mediate, arbitrate, or otherwise resolve any honest difference of opinion or viewpoint existing between any member of the public and any new motor vehicle dealer, manufacturer, manufacturer branch, distributor branch, or representative.

"(3) Order the department *to exercise any and all authority or power that the department may have* with respect to the issuance, renewal, refusal to renew, suspension, or revocation of the license of any new motor vehicle dealer, manufacturer, manufacturer branch, distributor, distributor branch, or representative . . . .

"(d) Hear and consider, within the limitations and in accordance with the procedure provided, a protest presented by a franchisee pursuant to Section 3060, 3062, 3064, or 3065. A member of the board who is a new motor vehicle dealer may not participate in, hear, comment, advise other members upon, or decide, any matter involving a protest filed pursuant to Article 4 (commencing with Section 3060)." (Italics added.)

■ The Board also has the authority, under section 3050, subdivision (c), to adjudicate matters involving the unlawful activities of the

manufacturer or franchisor as defined in sections 11713.2 and 11713.3. These activities include "preventing or requiring the sale or transfer of any part of the dealership, or unreasonably withholding consent to such sale . . . ." (*Yamaha II, supra*, 195 Cal.App.3d at p. 656.)[8]

### (2) *Franchise Protests*

■ Sections 3060, 3062, 3064, and 3065 give the Board jurisdiction over specified franchise disputes or protests. Section 3060 enumerates conditions under which a franchisor can terminate the franchise or modify the terms of the existing franchise agreement. Section 3062 restricts a franchisor's ability to establish or relocate a franchise. Section 3064 provides for the franchisor's vehicle delivery and preparation requirements. Section 3065 regulates warranty reimbursement agreements between franchisors and franchisees. Finally, section 3066 sets forth procedures the Board shall use to adjudicate disputes arising under these statutes.

These statutes demonstrate that the Legislature has granted the Board authority to consider and resolve only certain disputes between franchisors and franchisees. (See *Hardin Oldsmobile* v. *New Motor Vehicle Bd., supra*, 52 Cal.App.4th at pp. 590, 597.) The question remains how far that authorization extends.

---

[8]Section 11713.2 provides, in relevant part that "[i]t shall be unlawful and a violation of this code for any manufacturer, manufacturer branch, distributor, or distributor branch licensed under this code to coerce or attempt to coerce any dealer in this state:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(e) To enter into any agreement with the manufacturer, manufacturer branch, distributor, distributor branch, or to do any other act prejudicial to the dealer by threatening to cancel a franchise or any contractual agreement existing between the dealer and manufacturer, manufacturer branch, distributor, or distributor branch. . . ."

Section 11713.3 provides, in relevant part that "[i]t is unlawful and a violation of this code for any manufacturer, manufacturer branch, distributor, or distributor branch licensed under this code to do any of the following:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(d) To prevent or require, or attempt to prevent or require, by contract or otherwise, any dealer, . . . , or stockholder of any dealership, the sale or transfer of any part of the interest of any of them to any other person or persons. No dealer, . . . , or stockholder shall, however, have the right to sell, transfer, or assign the franchise, or any right thereunder, without the consent of the manufacturer or distributor except that the consent shall not be unreasonably withheld.

"(e) To prevent, or attempt to prevent, a dealer from receiving fair and reasonable compensation for the value of the franchised business. There shall be no transfer or assignment of the dealer's franchise without the consent of the manufacturer or distributor, which consent shall not be unreasonably withheld."

## 2. The Genesis of the Claim and the Authority Specifically Granted by the Legislature Determine the Scope of Section 3050, Subdivision (c).

### a. The Jurisdiction of the Board Is Limited

As previously discussed, this case departs from the usual dealer-manufacturer or franchisee-franchisor dispute because the interference claim does not derive from any contractual agreement with Honda and because section 3050 does not specifically give the Board jurisdiction over this type of dispute. These facts prohibit the Board from taking jurisdiction of such common law claims arising from Honda's alleged misconduct.

A series of appellate decisions has recognized the Board's statutory limitations. We find the analyses in those cases persuasive.

In *BMW of North America, Inc.* v. *New Motor Vehicle Bd., supra,* 162 Cal.App.3d 980, Hal Watkins (Watkins) claimed an exclusive right under his franchise agreement to sell BMW products in Ventura County. (*Id.* at pp. 983-984, 991.) Watkins filed a protest with the Board after BMW announced the appointment of a new dealership to be located 15.2 miles from his franchise. (*Id.* at p. 984.) He argued that the appointment of the new dealer constituted an improper modification of his franchise agreement, and the Board agreed. (*Id.* at pp. 984-985.) The Court of Appeal disagreed, and reversed. (*Id.* at p. 983.) The appellate court determined that under the 10-mile protest limitation in section 3062 and the clear language of the franchise agreement, Watkins was provided neither an exclusive right to sell BMW products in the entire county, nor any right to object to the appointment of a new franchise located 15.2 miles from his dealership. (162 Cal.App.3d at p. 991.) There was no modification of the franchise agreement. (*Ibid.*) The court found that the Board violated the parol evidence rule and exceeded its jurisdiction by rewriting the terms of an underlying franchise agreement. (*Id.* at p. 994.)

The court's ruling illustrated a limitation of the Board's authority. As the court explained, "[t]he Legislature has acted to regulate the relationship between franchisors and franchisees in the automobile industry, but has done so in a limited manner pursuant to clearly articulated and specifically expressed principles. Those principles provide that a franchisor may be required to continue unmodified an existing franchise agreement, or may be precluded from establishing or relocating a dealer within 10 miles of an existing dealer. Beyond those two qualifications . . . the Board has been given no power to regulate the relationship between franchisors and franchisees, . . . . [¶] . . . The power of the Board arises under the statute only

when [the] franchisor improperly 'terminate[s] or refuse[s] to continue any existing franchise' or impermissibly 'modif[ies] or replace[s] a franchise with a succeeding franchise.' (§ 3060.) None of the statutory predicates occurred here. Instead, in violation of the parol evidence rule, [the dealer] and the Board [attempted to] rewrite the franchise [agreement] . . . . Having rewritten the agreement, the Board then finds that BMW modified the recast franchise without good cause. . . . It is fundamental that an administrative agency has only such power as has been conferred upon it by the constitution or by statute and an act in excess of the power conferred upon the agency is void. [Citations.]" (*BMW of North America, Inc.* v. *New Motor Vehicle Bd., supra,* 162 Cal.App.3d at pp. 993-994.)

In *Ri-Joyce, Inc.* v. *New Motor Vehicle Bd.* (1992) 2 Cal.App.4th 445, 455 [3 Cal.Rptr.2d 546], the appellate court determined that "[t]he Board is a quasi-judicial administrative agency of limited jurisdiction. [Citation.] It does not have plenary authority to resolve any and all disputes which may arise between a franchisor and a franchisee. The Board's jurisdiction under section 3060 encompasses disputes arising over the attempted termination, replacement or modification of a franchise agreement. Claims arising from disputes with other legal bases must be directed to a different forum." (*Id.* at p. 455.)

Two recent decisions, *Miller* v. *Superior Court, supra,* 50 Cal.App.4th 1665 and *Hardin Oldsmobile* v. *New Motor Vehicle Bd., supra,* 52 Cal.App.4th 585, considered whether the Board's jurisdiction extended to common law tort claims alleging misconduct by Honda officials.

*Miller* examined the jurisdictional question in context of a party's right to a jury trial, and recognized the Board's limited jurisdiction when it construed subdivision (c) of section 3050. In *Miller,* "Ruth and Roger Miller bought a Honda dealership . . . [and] they were sued for not making payments to the sellers. The Millers then filed a cross-complaint against Honda for fraud and unfair business practices. In essence, the Millers alleged that they could not make any money because they refused to bribe Honda executives to obtain their fair share of popular Honda models." (50 Cal.App.4th at p. 1668, fn. omitted.)

*Miller* determined that ". . . the Millers' jury trial claim necessarily rests on whether the relevant administrative agency, here the Board, was established by the Legislature to adjudicate *all* disputes between new car dealers and manufacturers, or whether the Legislature had perhaps a slightly more modest role in mind. [¶] That question, in turn, boils down to the scope of the phrase 'any matter' as used in section 3050. . . ." (50 Cal.App.4th at p. 1674.)

After reviewing the statute, *Miller* observed that: "The structure of the statute reveals that the phrase 'any matter' in subdivision (c) . . . was not intended to confer sweeping or . . . 'plenary' power on the Board to adjudicate *every* matter between a new car dealer and a manufacturer. If the Legislature had intended *that*, subdivision (d) (directing the Board to hear protests presented by franchisees pursuant to certain statutes) would be utterly unnecessary, as would the limiting phrase in subdivision (c) concerning matters 'pursuant to Chapter 4 . . . . of Division 5.'" (50 Cal.App.4th at p. 1674.) *Miller* determined that "[t]he Board does not possess exclusive jurisdiction over a case *merely* because the litigants are a new car dealer and a manufacturer." (*Id.* at p. 1675.)

*Miller* then observed that under the doctrine of primary jurisdiction, there are "[s]ome common law claims, [that] by their nature, benefit from administrative expertise even though there is no steadfast requirement that the claim be first adjudicated by an administrative agency." (50 Cal.App.4th at p. 1676.) However, the court reasoned, "[w]hile the Board's expertise as to vehicle allocation would no doubt be extremely helpful, we do not forget that the Millers are claiming that allocation patterns were distorted because of widespread bribery." (*Id.* at p. 1677.) Considering all the issues, the court decided the matter should be remanded to the trial court to use its discretion to determine if the Board's expertise was required. (*Id.* at p. 1678.)

Finally, *Hardin Oldsmobile* determined that the Board's authority was limited to its specific statutory authorizations. (52 Cal.App.4th at p. 598.) In this vehicle allocation case, "litigation [arose] from Hardin's allegations of misdealing by Honda. Hardin claims Honda's executives received bribes and kickbacks in exchange for favors concerning the allocation of new cars and the location and ownership of new dealerships." (*Id.* at p. 587.) He filed a complaint alleging, inter alia, common law contract and tort claims. (*Id.* at p. 588.) The appellate court gave the phrase "any matter" in section 3050, subdivision (c), a limited interpretation and concluded the Board lacked jurisdiction to consider the claims. (52 Cal.App.4th at pp. 590, 598.)

The *Hardin* court observed that both the Board and Honda relied on section 3050, subdivision (c) as the source of authority "for the Board to exercise jurisdiction over this case[.]" (52 Cal.App.4th at p. 589.) "In particular, the Board and Honda point to the statutory authorization to consider 'any matter' . . . . [¶] Broadly defined, the phrase, '[c]onsider any matter . . . ,' would include consideration of criminal actions and labor disputes. No one, including, . . . , the Legislature that wrote it, would argue those matters fall under the jurisdiction of the Board; hence, the meaning of the phrase is limited. The best indication of the scope of the

limitation is found in the remainder of the subdivision, in which the Board is given authority to investigate the activities, resolve any honest differences of opinion or viewpoint with members of the public, and order the Department of Motor Vehicles to exercise its licensing authority over a malefactor." (*Id.* at p. 590.) Furthermore, the court considered the expansion of the Board's authority by the 1973 addition of sections 3060 through 3065 and determined: "If the Board already had plenary authority in all matters pursuant to the enabling legislation in 1967, including the authority to consider any matter and resolve disputes between franchisors and franchisees, it would not have been necessary for the Legislature to give the Board jurisdiction, in 1973, over franchise disputes." (52 Cal.App.4th at p. 590.)

After analyzing the wording of section 3050, the *Hardin* court determined that "[f]rom the remainder of Vehicle Code section 3050, subdivision (c), it is evident the Legislature intended to limit the jurisdiction of the Board to consideration and resolution of only a circumscribed domain of matters. . . . [Furthermore,] [b]oth the benign terminology and the absence of express authority to award the full panoply of damages, . . . , establish the Legislature did not intend to replace the courts with the Board in presiding over traditional litigation involving a broad range of statutory and common law causes of action, as the Board seeks to do here." (52 Cal.App.4th at p. 591.)

*Hardin* concluded that issues of misfeasance and corruption by Honda officials were not the type of matters the Board should consider. (52 Cal.App.4th at pp. 593-597.) "While the Vehicle Code gives the Board statutory authority to hear specific protests by franchisees and also gives general authority to resolve honest differences of opinion between licensees and members of the public, it does not replace the judiciary with the Board as the forum for litigating other statutory and common law causes of action." (*Id.* at p. 597.) Additionally, the court noted, the Board could "not assert jurisdiction beyond the bounds of its statutory authorization," and "[t]he status of the litigants . . . does not confer jurisdiction on the Board over common law claims and statutory claims not specifically committed to it." (*Id.* at p. 597.) The *Hardin* court would not permit Honda to "hide behind the Board" when faced with Hardin's misconduct charges. (*Id.* at p. 598.)

These decisions confirm our conclusion that the Board's jurisdiction is limited. The Board can only exercise jurisdiction only over "any matter" or dispute specifically enumerated in section 3050.

b.  *Honda's Reliance on a Broad Statutory Interpretation of Section 3050, Subdivision (c) Is Not Warranted by the Facts of This Case.*

Honda contends that under a broad interpretation of the "*any matter*" language in section 3050, subdivision (c), the claim of the Hix heirs is

subject to Board jurisdiction because the allegation that Honda interfered with the sale of a dealership constituted a violation of section 11713.3, subdivisions (d) and (e). Honda, however, mischaracterizes the Hix heirs' action as a "failure to consent" case.

Neither Honda nor the Hix heirs seek to enforce the terms of Honda's franchise agreement with Friedlander. Board jurisdiction would be appropriate if Friedlander were seeking to enforce a "consent" clause against Honda under the terms of his franchise agreement.[9] Hix, however, had no contractual agreement with Honda. The common law interference claim arose independently from Honda's alleged bribery scheme, not from the franchise agreement between Honda and Friedlander. Honda's actions adversely affected independent contractual agreements between Hix and Friedlander.

*The Yamaha Cases*

To support its position, Honda relies on the *Yamaha* line of cases: *Yamaha I, supra*, 185 Cal.App.3d 1232, *Yamaha II, supra*, 195 Cal.App.3d 652, and *Mathew Zaheri Corp.* v. *Mitsubishi Motor Sales, supra*, 17 Cal.App.4th 288. Under the facts of our case, however, Honda's legal authorities are inapplicable.

The *Yamaha* decisions interpreted the essence of the disputes between franchisees and franchisors to be conduct regulated or proscribed by section 3050 and thus to be matters coming within the Board's authority. As such, franchisees were required to exhaust their administrative remedies before seeking relief in the trial court. We do not agree with Honda that this "exhaustion necessity" applies when a nonsignatory to the franchise agreement brings a common law tort claim that neither derives from the terms of the agreement nor is included within the disputes covered by section 3050.

Our case does not involve the modification or termination of a franchise (§§ 3060, 3061), the establishment or relocation of a franchise (§ 3062), the violation of delivery or preparation obligations (§ 3064), the violation of any warranty agreements (§ 3065), or any violation of sections 11713.2 or 11713.3. The misconduct alleged by the Hix heirs, by contrast, differs vastly from that present in the *Yamaha* cases. When a nonsignatory to a franchise agreement brings a common law tort claim based on allegations of commercial bribery, independent from any franchisor-franchisee relationship or agreement, the claim, as a matter of law, cannot be included within the disputes covered by section 3050.

---

[9]The record reflects that Friedlander did file a petition with the Board alleging claims of Honda's misconduct under the terms of his franchise agreement.

## CONCLUSION

We conclude that the Board can only exercise the authority granted by the Legislature in the Vehicle Code. Under *Miller* v. *Superior Court, supra,* 50 Cal.App.4th 1665 and *Hardin Oldsmobile* v. *New Motor Vehicle Bd., supra,* 52 Cal.App.4th 585, the Board's authority is limited to statutory authorizations in section 3050, and the phrase "any matter" in subdivision (c) refers only to those specific grants of power. Therefore, the Board's jurisdiction does not extend to *all* disputes between dealers and manufacturers.

Hix had no contractual relationship with Honda. His independent contractual arrangements with a dealer were allegedly adversely affected by Honda's widespread misconduct. Nothing in the statutory scheme granted the Board jurisdiction over the common law claims asserted by the Hix heirs. Therefore, the heirs were not required to first present the claim to the Board before filing the lawsuit.

Finally, *Miller* gave the trial court discretion to decide if it could benefit from the Board's expertise under the theory of primary jurisdiction. (*Miller* v. *Superior Court, supra,* 50 Cal.App.4th at p. 1678.) In our case, the trial court does not have such discretion. As a matter of law, we find that the Board does not have more expertise and knowledge in the area of commercial bribery schemes than do the courts.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court to vacate the order granting judgment in favor of Honda and reinstate the complaint. Honda is to answer within 20 days after the remittitur has issued. The Hix heirs are awarded costs on appeal.

Croskey, Acting P. J., and Aldrich, J., concurred.