[No. C008797. Third Dist. Jan. 7, 1992.]

RI-JOYCE, INC., Plaintiff and Respondent, v.
NEW MOTOR VEHICLE BOARD, Defendant and Appellant;
MAZDA MOTORS OF AMERICA, INC., Real Party in Interest and
Appellant.

446

COUNSEL

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Vincent J. Scally, Jr., and Daniel J. Turner, Deputy Attorneys General, for Defendant and Appellant.

Pilot, Spar & Siegler and A. Albert Spar for Real Party in Interest and Appellant.

Geary, Shea, O'Donnell & Grattan and Thomas C. Taylor, Jr., for Plaintiff and Respondent.

OPINION

SPARKS, Acting P. J.—The New Motor Vehicle Board (Board), and Mazda Motors of America, Inc. (Mazda), appeal from a judgment of the Sacramento County Superior Court granting a petition for a peremptory writ of mandate in favor of Ri-Joyce, Inc. (Ri-Joyce). Ri-Joyce, a Mazda dealer in Santa Rosa, had attempted to protest the establishment of a new Mazda dealership

in Petaluma, more than 10 miles from Ri-Joyce's dealership. The Board found this court's decision in *BMW of North America, Inc.* v. *New Motor Vehicle Bd.* (1984) 162 Cal.App.3d 980 [209 Cal.Rptr. 50] (hereafter *BMW* or the *BMW* case), to be controlling and dismissed the protest. The trial court concluded that our decision in the *BMW* case was not controlling and issued a writ of mandate directing the Board to set aside its decision and to consider the protest. The court expressly cautioned, however, that "nothing in this judgment or [the] writ shall limit or control in any way the discretion legally vested in [the Board]." We agree with the decision of the trial court and shall affirm the judgment.

The relevant facts are straightforward and we will refer to them as necessary in our discussion.

## DISCUSSION

The Board has jurisdiction to consider dealer-franchisee protests of certain types of intended actions of a franchisor under Vehicle Code sections 3060 through 3063, which we have set out in full in an appendix to this opinion. (Unless otherwise specified all further section references are to the Vehicle Code.) Under the first portion of section 3060, a franchisor is prohibited from terminating or refusing to continue an existing franchise without complying with certain procedural requirements and, if a protest if filed, unless the Board finds there is good cause. The second portion of section 3060 precludes a franchisor from modifying or replacing a franchise with a succeeding franchise if the modification or replacement would substantially affect the franchisee's sales or service obligations or investment, unless the franchisor complies with procedural requirements and, if a protest is filed, the Board finds good cause. A franchisor has the burden of establishing good cause for terminating or refusing to continue a franchise and, if it would substantially affect the franchisee's sales or service obligations or investment, for modifying or replacing a franchise with a succeeding franchise. (§ 3060.) The relevant factors to be considered by the Board with respect to a protest under section 3060 are set forth in section 3061.

Section 3062 limits the ability of a franchisor to establish a new dealership or relocate an existing dealership within an area where the same line/make is already represented. Under that section an existing dealer may file a protest

of the franchisor's decision to establish or relocate another dealership within the same "relevant market area." A relevant market area is "any area within a radius of 10 miles from the site of a potential new dealership." (§ 507.) Upon a protest the Board can preclude the franchisor from establishing or relocating the proposed new dealership if the existing dealer can establish good cause for not permitting the dealership within its relevant market area. (§ 3062.) The relevant factors to be considered are set forth in section 3063.

In *BMW, supra,* 162 Cal.App.3d 980, a BMW dealer in Camarillo, in Ventura County, sought to protest the establishment of a new BMW dealership in the Thousand Oaks-Westlake area of that same county. The dealer's franchise agreement reserved to the franchisor the power to appoint additional dealers and the new dealership was to be located at a site beyond the relevant market area of the existing dealer. Nevertheless, the existing dealer claimed that the establishment of the new dealership pursuant to the reserved power was contrary to public policy and void. We disagreed, concluding that section 3062 "not only restricts the right of a franchisee to object to the appointment of a new dealer to the 10-mile radius, but it also implicitly recognizes the right of a franchisor to appoint new dealers, subject of course to the right of an existing dealer to show good cause for precluding such appointment if it is to be within 10 miles of the existing dealer." (*Id.* at p. 991.)

In the *BMW* case the dealer made the alternative argument that the establishment of the new dealership would constitute a modification of his franchise which could be protested under section 3060. In making this argument the dealer relied upon the franchisor's use of an "A.O.R." (area of responsibility) system of planning and evaluation. Under this planning system all post office zip codes were assigned to the A.O.R. of the nearest dealership. The franchisor was able to determine the number of its vehicles which were registered to addresses within particular zip codes. This aided the franchisor in anticipating the service and parts requirements for particular areas as well as in evaluating its competitive performance in those areas. For these planning purposes all post office zip codes were assigned to an A.O.R. of an existing dealer, regardless how distant the dealership may have been. Accordingly, the establishment of a new dealership would necessarily change the A.O.R. of the nearest existing dealers since zip code areas closer to the new dealership would be considered part of its A.O.R. In the *BMW* case the dealer claimed, and the Board and trial court agreed, that the change

in his A.O.R. which would occur with the establishment of the new dealership would constitute a modification of his franchise. (162 Cal.App.3d at pp. 991-993.)

We rejected the dealer's claim in that case under the parol evidence rule. We explained the rule as follows: "The parol evidence rule is a fundamental rule of contract law which operates to bar extrinsic evidence contradicting the terms of a written contract. It is not merely a rule of evidence but is substantive in scope. Under that rule the act of executing a written contract, whether required by law to be in writing or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument. Extrinsic evidence cannot be admitted to prove what the agreement was, not for any of the usual reasons for exclusion of evidence, but because as a matter of law the agreement is the writing itself. Consequently, 'in determining whether substantial evidence supports a judgment, extrinsic evidence inconsistent with any interpretation to which the instrument is reasonably susceptible becomes irrelevant; as a matter of substantive law such evidence cannot serve to create or alter the obligations under the instrument. ██ ██ Irrelevant evidence cannot support a judgment.' " (*BMW, supra,* 162 Cal.App.3d at pp. 990, citations & fn. omitted.)[1]

A short and vernacular explanation of the parol evidence rule would be that a party to a written contract cannot be permitted to urge that a contract means something which its written terms simply cannot mean. In the *BMW* case the written terms of the parties' contract expressly provided that the dealer was not given the exclusive right to deal in BMW products in any particular geographic area and was not limited in the area in which he could trade. BMW expressly reserved the right to appoint other dealers in BMW products. This contractual language was not reasonably susceptible to a construction which would give the dealer an exclusive trading area or which

---

[1]There are two aspects to the parol evidence rule. First, while extrinsic evidence may not be introduced to contradict the written terms of a contract, such evidence may be introduced to explain the meaning of a written contract so long as the meaning urged is one to which the written contract terms are reasonably susceptible. (See *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].) Second, where a written contract is not an integration, that is, the final and complete agreement of the parties, then extrinsic evidence may be introduced as to any matter on which the agreement is silent and which is not inconsistent with its written terms. (See *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 226-228 [65 Cal.Rptr. 545, 436 P.2d 561].)

would permit him to object to the establishment of a new dealership beyond the limits of his relevant market area. BMW's use of the A.O.R. planning system could not operate to modify the express terms of the dealer's contract. Since the dealer's franchise agreement permitted BMW to establish new dealerships and the new dealership was beyond the existing dealer's relevant market area, we concluded that the Board exceeded its jurisdiction in upholding the dealer's protest. (162 Cal.App.3d at p. 994.)

█ The situation in this case bears many similarities to the *BMW* case. In the past Mazda has used a planning mechanism similar to the A.O.R. system which was used by BMW. Under its dealer agreement Mazda is required to perform periodic reviews of a dealer's past performance and of anticipated sales, service, parts and other matters affecting the past, present and future conduct of the dealer's business and its relationship with Mazda. Until at least 1982 Mazda utilized what it referred to as an "APR" (area of primary responsibility) in performing this function. Under the APR scheme postal zip codes were assigned to the APR of a nearby dealer. Here, as in the *BMW* case, the dealer maintains that the alteration of its APR by establishment of another dealership would constitute a modification of its franchise which may be protested under section 3060.[2]

If only these circumstances were present, the *BMW* decision would appear to be directly controlling. However, Ri-Joyce asserts that its situation is different because in *BMW* the A.O.R. scheme was an "internal planning mechanism" (162 Cal.App.3d at pp. 992-993), while in this case the APR scheme, when it was in use, was set forth in writing as part of Mazda's dealer operating standards, which are considered written instructions and part of the franchise agreement. This distinction lacks legal significance. Mazda's dealer agreement consists of a basic agreement, various additional agreements, and written instructions. The basic agreement provides: "If there is a conflict between them, provisions set forth in the Basic Agreement shall

---

[2]It appears that sometime after 1982 Mazda discontinued providing dealers with written notice of their APR's. Since at least 1987 Mazda's dealer agreements make no reference to an APR. Ri-Joyce asserts that its former APR is part of its current franchise agreement because the current agreement incorporates prior written instructions to the dealer. In fact, the current dealer agreement does not incorporate prior written instructions to the specific dealer. Instead, it incorporates current written instructions which are applicable to dealers generally, which would exclude prior instructions specific to a particular dealer. However, we need not consider whether Ri-Joyce's former APR somehow remains a part of its agreement since we find this aspect of its argument meritless in any event.

govern over the additional agreements, which shall govern over the written instructions." Throughout the period Mazda used the APR planning system its basic agreement specifically provided that a dealer's appointment was nonexclusive and, in a provision we will discuss more fully in a subsequent portion of this opinion, Mazda reserved the right to establish new dealerships. Moreover, throughout this period the written document by which Mazda informed a dealer of its APR specifically provided: "Dealer acknowledges that the above area is subject to modification by Mazda and that dealer's rights with respect to such area are non-exclusive." Ri-Joyce's claim that its franchise agreement gave it exclusive and unmodifiable rights within an APR is in direct contradiction to the written terms of its agreement and under the parol evidence rule, as applied in the *BMW* case, the Board would have no authority to uphold Ri-Joyce's protest under section 3060 based upon this argument.

■ We also reject Ri-Joyce's assertion that in 1982 it effected a unilateral amendment of its franchise to secure for itself an exclusive and unmodifiable trading area defined by its former APR. It appears that during the time Mazda used the APR scheme it periodically presented a dealer with a written document setting out the zip codes in the dealer's APR which, as we have noted, provided that the APR was modifiable and nonexclusive. On several occasions principals of Ri-Joyce signed these APR documents. In 1982 the zip codes assigned to Ri-Joyce's APR were reduced and Ri-Joyce did not sign the document. It was returned to Ri-Joyce with the notation "Dealer Refused to Sign." The written Mazda dealer agreement provides that it "constitutes the entire agreement and understanding between DEALER and MAZDA with respect to the subject matter hereof and supersedes all prior or present agreements and understandings, written or oral, between the parties with respect to the subject matter hereof. The MAZDA Dealer Agreement may be amended, modified, supplemented or interpreted only by a written instrument signed by DEALER and the President or any of the Vice Presidents of MAZDA." Ri-Joyce's refusal to sign its APR document in 1982 cannot be held to have secured an exclusive, unmodifiable trading area contrary to the express written terms of its franchise agreement.

Ri-Joyce asserts that in connection with the 1982 franchise renewal it was assured that Mazda was satisfied with its performance and intended to continue the relationship indefinitely. At that time Mazda was aware that Ri-Joyce's lease was expiring and that it would need to relocate. In January 1983, Ri-Joyce relocated its dealership to a nearby site and in doing so was

required to buy out its old lease. In 1987 the owners of Ri-Joyce purchased the land and facilities and expanded the service area at considerable expense. Ri-Joyce asserts that it took these actions in reliance upon representations that Mazda would continue the relationship, which it took to mean that Petaluma would be preserved as part of its territory.

We have noted that the Mazda dealer agreement specifically provides that it may be amended only in writing signed by Mazda's president or one of its vice-presidents. The agreement also provides: "DEALER acknowledges that designated field representatives of MAZDA having responsibility for communications with DEALER on behalf of MAZDA with respect to day-to-day operational matters do not have authority to represent MAZDA or make commitments on behalf of MAZDA concerning matters of interpretation of the MAZDA Dealer Agreement or matters of policy affecting the relationship of DEALER and MAZDA, including without limitation matters involving: . . . (iv) the appointment of another Dealer near DEALER's Approved Location; or (v) the termination or renewal of the MAZDA Dealer Agreement. Accordingly, DEALER may not rely on any such field representative of MAZDA with respect to such matters. If DEALER has any questions concerning matters of interpretation of the MAZDA Dealer Agreement or other policy matters, DEALER shall consult with an appropriate officer of MAZDA having executive responsibility for the matter in question, including MAZDA's general manager." Accordingly, Ri-Joyce cannot rely upon vague oral statements of field representatives in asserting rights under its franchise agreement which are directly contrary to its written terms.[3]

To the extent Ri-Joyce may be relying upon an estoppel or perhaps a claim of fraud, the argument is addressed to the wrong forum. ■ The Board is a quasi-judicial administrative agency of limited jurisdiction. (*BMW, supra,* 162 Cal.App.3d at p. 994.) It does not have plenary authority to resolve any and all disputes which may arise between a franchisor and a franchisee. The Board's jurisdiction under section 3060 encompasses disputes arising over the attempted termination, replacement or modification of a franchise agreement. Claims arising from disputes with other legal bases must bedirected to a different forum.

---

[3]We do not imply that this evidence is irrelevant. To the extent the written contract is reasonably susceptible of a meaning urged by Ri-Joyce, evidence of the manner in which the parties acted under the contract is admissible to support that meaning. (*Bohman* v. *Berg* (1960) 54 Cal.2d 787, 795 [8 Cal.Rptr. 441, 356 P.2d 185]; *Automobile Salesmen's Union* v. *Eastbay Motor Car Dealers, Inc.* (1970) 10 Cal.App.3d 419, 424 [89 Cal.Rptr. 20].) And, if it should be determined that Mazda is attempting to modify Ri-Joyce's franchise, then evidence of Ri-Joyce's investment is an important consideration in determining whether such modification should be allowed. (§§ 3060, 3061.) We hold only that the scenario relied upon by Ri-Joyce cannot be held to have effected an amendment of its written contract and cannot be introduced to support a meaning to which the contract's written terms are not reasonably susceptible.

Although we have agreed with the Board and Mazda up to this point, we nevertheless perceive a significant difference between the franchise agreement involved here and the one involved in the *BMW* case. This difference renders this case inappropriate for summary disposition by dismissal of Ri-Joyce's protest.

Initially we must clarify an apparent misconception concerning the extent of the holding in the *BMW* case. The Board and Mazda seem to believe that we held in *BMW* that the Board has no jurisdiction to consider a protest based upon the establishment of a new dealership beyond an existing dealer's relevant market area regardless of the terms of the existing dealer's franchise agreement. The *BMW* decision was not so expansive. There the franchisor had expressly reserved the unqualified power to establish new dealerships and we held that nothing in the New Motor Vehicle Board Act precluded a franchisor from reserving such power or entitled a franchisee to object to the exercise of such reserved power beyond his relevant market area. (162 Cal.App.3d at p. 991.) ■ We did not hold that the act precluded a franchisor from granting an exclusive trading area beyond a dealer's relevant market area or that a franchisee would be precluded from protesting the modification of such an agreement by establishment of a new dealer within such an exclusive trading area. (*Ibid.*) That is a matter which is left to the agreement of the parties. If a franchise agreement does grant a dealer an exclusive, unmodifiable trading area then encroachment upon that area may constitute a modification of the franchise which is subject to protest under section 3060.[4]

In the *BMW* case the franchisor had reserved the unqualified power to appoint new dealers whether in the dealer's geographical area or elsewhere. (*BMW, supra,* 162 Cal.App.3d at p. 984.) In contrast, in Mazda's dealer agreement the franchisor reserved a qualified right to appoint new dealers. The agreement provides: "DEALER and MAZDA acknowledge that they may not fulfill their respective expectations for the business contemplated by the MAZDA Dealer Agreement and agree that in such event the parties may take any one or more of the following actions, consistent with applicable law: (i)

---

[4]Although some dealers seem to believe that the New Motor Vehicle Board Act was enacted to protect them against competition, quite the contrary is true. The act recognizes that a new motor vehicle dealership may require a significant investment and that there is a disparity of bargaining power and thus the act was intended to protect new motor vehicle dealers against unfair or oppressive trade practices. (*BMW, supra,* 162 Cal.App.3d at p. 987.) But the act recognizes that the needs of consumers are important and that competition is in the public interest. (§§ 3061, 3063.) Accordingly, a dealer cannot prevail on a protest simply by asserting a desire to limit competition. Moreover, since the interests of consumers are to be considered (*ibid.*), where a franchisor has granted an exclusive trading area beyond a relevant market area, justification for modifying the franchise will be more easily established the further a new franchise is located from the existing dealer's location.

DEALER or MAZDA may elect to terminate or not renew the MAZDA Dealer Agreement as provided herein; (ii) DEALER may elect to utilize some of its resources to engage in businesses involving the promotion, sale and service of products other than MAZDA Products, including those which may be competitive with MAZDA Products; or (iii) if MAZDA determines it would be in the best interests of customers or MAZDA to do so, MAZDA may elect to appoint another dealer to promote, sell and service MAZDA Products near DEALER's Approved Location. DEALER and MAZDA shall give each other at least sixty days' written notice prior to taking any of the foregoing actions, for the purpose of enabling the parties to discuss whether there exist any mutually agreeable alternatives to the proposed action. To the extent any consent is required from a party, such party will not unreasonably withhold its consent to any of the foregoing actions by the other."

 Under this franchise agreement Mazda reserved a qualified right to establish a new dealership "near" Ri-Joyce's approved location. "Near" is not defined in the agreement. Mazda asserts that "near" should be construed consistent with section 3062 so that it corresponds with Ri-Joyce's relevant market area. That is one, but not the only, possible interpretation of the contractual term. The contract is reasonably susceptible of the meaning urged by Ri-Joyce, that is, that "near" includes a neighboring community which has traditionally been served by Ri-Joyce and which produces a significant portion of its business.

Mazda's franchise agreement provides that the appointment of another dealer near Ri-Joyce's location is an action Mazda may take in the event its business expectations are not fulfilled and if Mazda determines that it would be in the best interests of customers or of Mazda to do so. This reservation of the power to establish another dealership is broad but not unlimited. A contract that confers discretionary decisionmaking authority upon one of the parties may be construed to require an objective standard of reasonableness or may be construed to permit the party to make a decision based upon subjective factors. In either case it will be implied that the party must exercise its judgment in good faith. (*Bleecher v. Conte* (1981) 29 Cal.3d 345, 352-353 [213 Cal.Rptr. 852, 698 P.2d 1154]; *Larwin-Southern California, Inc.* v. *JGB Investment Co.* (1979) 101 Cal.App.3d 626, 638-639 [162 Cal.Rptr. 52]; *Guntert* v. *City of Stockton* (1974) 43 Cal.App.3d 203, 209 [117 Cal.Rptr. 601].) The meaning and scope of Mazda's reservation of the power to appoint another dealer near Ri-Joyce's approved location is a matter which may be illuminated by extrinsic evidence and which Ri-Joyce must be accorded an opportunity to establish.

If Ri-Joyce is correct in its claim that the proposed Petaluma dealership is "near" its approved location within the meaning of the contract, then Mazda

would not be precluded from establishing the Petaluma dealership but at a minimum it would be required to exercise good faith in deciding to do so. And, Mazda could take such action only after conferring with Ri-Joyce as to any mutually agreeable alternatives. The unilateral establishment of a nearby dealership without conferring with Ri-Joyce and without any attempt at justification pursuant to the contract would constitute an attempted modification of the contract which would be subject to protest under section 3060.

Like the trial court, we do not mean to suggest a particular result or otherwise limit the discretion of the Board. ▆ Where a franchisee asserts that a franchisor is attempting to modify his franchise the first step is to determine what rights were granted under the franchise. Within the meaning of section 3060 a franchise is a written agreement of the parties which is subject to the normal rules relating to the interpretation of contracts. (§ 331; *BMW, supra*, 162 Cal.App.3d at p. 990.) ▆ Where a franchise agreement is reasonably susceptible to the meaning urged by a franchisee, the Board must hear and consider such extrinsic evidence as the franchisee can produce in order to determine what rights were granted under the agreement. (See *Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113, 1143 [234 Cal.Rptr. 630].) Only then can it be determined whether the franchisor's proposed action constitutes a modification of the franchise. If it does not then the franchisor is entitled to prevail. If it does then the Board must proceed with further consideration of the protest. Since in this case the franchise agreement is reasonably susceptible to the meaning urged by Ri-Joyce, it was entitled to an evidentiary hearing at which it could produce evidence in support of that interpretation. (*Ibid.*)

### DISPOSITION

The judgment is affirmed.

Sims, J., and Marler, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied April 16, 1992.

## Appendix

At all times relevant to this case Vehicle Code section 3060 provided: "Notwithstanding Section 20999.1 of the Business and Professions Code or the terms of any franchise, no franchisor shall terminate or refuse to continue any existing franchise unless all of the following conditions are met: [¶] (a) The franchisee and the board have received written notice from the franchisor as follows: [¶] (1) Sixty days before the effective date thereof setting forth the specific grounds for termination or refusal to continue. [¶] (2) Fifteen days before the effective date thereof setting forth the specific grounds with respect to any of the following: [¶] (A) Transfer of any ownership or interest in the franchise without the consent of the franchisor, which consent shall not be unreasonably withheld. [¶] (B) Misrepresentation by the franchisee in applying for the franchise. [¶] (C) Insolvency of the franchisee, or filing of any petition by or against the franchisee under any bankruptcy or receivership law. [¶] (D) Any unfair business practice after written warning thereof. [¶] (E) Failure of the motor vehicle dealer to conduct its customary sales and service operations during its customary hours of business for seven consecutive business days, giving rise to a good faith belief on the part of the franchisor that the motor vehicle dealer is in fact going out of business, except for circumstances beyond the direct control of the motor vehicle dealer or by order of the department. [¶] (3) The written notice shall contain, on the first page thereof, a conspicuous statement which reads as follows: 'NOTICE TO DEALER: You may be entitled to file a protest with the NEW MOTOR VEHICLE BOARD in Sacramento and have a hearing on your protest under the terms of the California Vehicle Code if you oppose this action. It is important that you act promptly.' [¶] (b) The board finds that there is good cause for termination or refusal to continue, following a hearing called pursuant to Section 3066. The franchisee may file a protest with the board within 30 days after receiving a 60-day notice or within 10 days after receiving a 15-day notice. When a protest is filed, the board shall advise the franchisor that a timely protest has been filed, that a hearing is required pursuant to Section 3066, and that the franchisor may not terminate or refuse to continue until the board makes its findings. [¶] (c) The franchisor has received the written consent of the franchisee, or the appropriate period for filing a protest has elapsed. [¶] The franchisor shall not modify or replace a franchise with a succeeding franchise if the modification or replacement would substantially affect the franchisee's sales or service obligations or investment, unless the franchisor has first given the board and each affected franchisee notice thereof at least 60 days in advance of the modification or replacement. Within 30 days of receipt of the notice, a franchisee may file a protest with the board and the modification or replacement does not become effective until there is a

finding by the board that there is good cause for the modification or replacement. If, however, a replacement franchise is the successor franchise to an expiring or expired term franchise, the prior franchise shall continue in effect until resolution of the protest by the board. In the event of multiple protests, hearings shall be consolidated to expedite the disposition of the issue." (Stats. 1984, ch. 247, § 2, pp. 754-755.)

Vehicle Code section 3061 provides: "In determining whether good cause has been established for modifying, replacing, terminating, or refusing to continue a franchise, the board shall take into consideration the existing circumstances, including, but not limited to, all of the following: [¶] (a) Amount of business transacted by the franchisee, as compared to the business available to the franchisee. [¶] (b) Investment necessarily made and obligations incurred by the franchisee to perform its part of the franchise. [¶] (c) Permanency of the investment. [¶] (d) Whether it is injurious or beneficial to the public welfare for the franchise to be modified or replaced or the business of the franchisee disrupted. [¶] (e) Whether the franchisee has adequate motor vehicle sales and service facilities, equipment, vehicle parts, and qualified service personnel to reasonably provide for the needs of the consumers for the motor vehicles handled by the franchisee and has been and is rendering adequate services to the public. [¶] (f) Whether the franchisee fails to fulfill the warranty obligations of the franchisor to be performed by the franchisee. [¶] (g) Extent of franchisee's failure to comply with the terms of the franchise."

Vehicle Code section 3062 provides: "(a) Except as otherwise provided in subdivision (b), if a franchisor seeks to enter into a franchise establishing an additional motor vehicle dealership within a relevant market area where the same line-make is then represented, or seeks to relocate an existing motor vehicle dealership, the franchisor shall, in writing, first notify the board and each franchisee in that line-make in the relevant market area of the franchisor's intention to establish an additional dealership or to relocate an existing dealership within or into that market area. Within 20 days of receiving that notice or within 20 days after the end of any appeal procedure provided by the franchisor, any such franchisee may file with the board a protest to the establishing or relocating of the dealership. If, within this time a franchisee files with the board a request for additional time to file a protest, the board or its secretary, upon a showing of good cause, may grant an additional 10 days to file the protest. When such a protest is filed, the board shall inform the franchisor that a timely protest has been filed, that a hearing is required pursuant to Section 3066, and that the franchisor shall not establish or relocate the proposed dealership until the board has held a hearing as provided in Section 3066, nor thereafter, if the board has determined that there is good cause for not permitting the dealership. In the event

of multiple protests, hearings may be consolidated to expedite the disposition of the issue. [¶] For the purposes of this section, the reopening in a relevant market area of a dealership that has not been in operation for one year or more shall be deemed the establishment of an additional motor vehicle dealership. [¶] (b) Subdivision (a) does not apply to either of the following: [¶] (1) The relocation of an existing dealership to any location which is both within the same city as, and is within one mile from, the existing dealership location. [¶] (2) The establishment at any location which is both within the same city as, and is within one-quarter mile from, the location of a dealership of the same line-make that has been out of operation for less than 90 days. [¶] (c) Subdivision (a) does not apply to any display of vehicles at a fair, exposition, or similar exhibit if no actual sales are made at the event and the display does not exceed 30 days. This subdivision shall not be construed to prohibit a new motor vehicle dealer from establishing a branch office for the purpose of selling vehicles at the fair, exposition, or similar exhibit, even though that the event is sponsored by a financial institution, as defined in Section 31041 of the Financial Code or by a financial institution and a licensed dealer. The establishment of these branch offices, however, shall be in accordance with subdivision (a) where applicable. [¶] (d) For the purposes of this section, the reopening of a dealership that has not been in operation for one year or more shall be deemed the establishment of an additional motor vehicle dealership."

Vehicle Code section 3063 provides: "In determining whether good cause has been established for not entering into or relocating an additional franchise for the same line-make, the board shall take into consideration the existing circumstances, including, but not limited to, all of the following: [¶] (a) Permanency of the investment. [¶] (b) Effect on the retail motor vehicle business and the consuming public in the relevant market area. [¶] (c) Whether it is injurious to the public welfare for an additional franchise to be established. [¶] (d) Whether the franchisees of the same line-make in that relevant market area are providing adequate competition and convenient consumer care for the motor vehicles of the line-make in the market area which shall include the adequacy of motor vehicle sales and service facilities, equipment, supply of vehicle parts, and qualified service personnel. [¶] (e) Whether the establishment of an additional franchise would increase competition and therefore be in the public interest."