Daniel NEAR, et al., Plaintiffs,

v.

DEPARTMENT OF ENERGY,
et al., Defendants.

No. CV S–02–57 LKK.

United States District Court,
E.D. California.

May 2, 2003.

Daniel A. Near, Folsom, CA, for Plaintiffs.

Bobbi J. Montoya, Assistant U.S. Attorney, United States Attorney, Sacramento, CA, for Defendant.

## ORDER

KARLTON, Senior District Judge.

Plaintiffs sue to enjoin an agency of the United States, the Western Area Power Administration, Department of Energy ("WAPA"), from cutting down certain trees on their property. The government has counter-claimed, seeking to enforce the terms of its easement which, it claims, would require plaintiffs to remove certain structures from the easement and would allow the government to cut down certain trees. The case is before the court on the government's motion for summary judgment on its counter-claim. I decide the matter on the pleadings and the papers on file herein and after oral argument.

### I.

### UNDISPUTED FACTS

In 1952, the land now belonging to plaintiffs was subject to a Declaration of Taking. Under that declaration, the United States acquired an easement providing for the right to construct, operate and maintain towers, poles and power lines for the purpose of transmitting electric energy over, through, and across the land described in the Declaration of Taking. *See* 1952 Declaration of Taking, Pl's Exh. A at 3:2–9. The easement also includes:

> the right and privilege to enter upon, survey, and travel along the said land and to patrol, repair, control, use, construct, and reconstruct the said transmission line or lines, and to trim and remove at any place trees, brush, or other objects interfering therewith or considered by the United States to be dangerous thereto.

*Id.* at 3:28–32. Reserved from the easement was the owners' "right and privilege to cultivate, use, and occupy the said land for any purpose consistent with the right and privilege hereby taken which will not interfere with or endanger any of the equipment of the United States, or the use thereof . . . ." *Id.* at 4:6–10. This reservation, however, did not "include the right and privilege" to "erect buildings or structures, or place or pile up materials thereon." *Id.* at 4:25–29.

The easement acquired by the United States was used to construct the Folsom–Roseville 230–kV transmission line, which is operated and maintained by the United States, through WAPA. That agency has issued certain "Guidelines Concerning the Use of Electrical Transmission Line Rights–of–Way," referred to herein as the "General Guidelines." They provide that to protect the safety of the public, low growing vegetation is allowed only if its maximum height does not exceed twelve feet at maturity. *See* General Guidelines, Pl's Exh. M at 1, ¶ 1.D. In addition, the General Guidelines provide that, for protection of the transmission line structure, thirty feet of unobstructed access must be maintained around the towers. *See id.* at 2, ¶ 5.D. The General Guidelines also indicate that vegetation and encroachments on the easement require WAPA crews to take action, which may place them at risk. Thus, for employee safety, the General Guidelines provide, vegetation or encroachments that present a risk to employees will not be allowed. *Id.* at 1 ¶ 2. Finally, the General Guidelines provide that buildings or structures should not be erected on the easement. *Id.* at 1:3(3). The Guidelines make clear, however, that they have "been prepared only as a guide. Each right-of-way encroachment will be evaluated on an individual basis." *Id.* at 1.

At issue in this case are plaintiffs' encroachments on the easement, which are alleged to violate the easement. Below, I describe the condition of the easements.

Plaintiffs Edward and Sara Myers are recorded owners of property subject to the easement. Trees are growing on the por-

tion of the Myers' property that is subject to the easement. The largest tree growing there is approximately thirty-five feet tall.

Plaintiffs Daniel Near and Denise Mayhugh are also recorded owners of property subject to the easement. Three redwood trees are growing on the portion of the Near/Mayhugh property that is subject to the easement, adjacent to the transmission tower No. 1/1. Two of the redwood trees were approximately 30 feet in height before they were trimmed by Near. The redwood trees can grow to a height of at least 90 feet. There is also a metal storage shed on the easement.

Over the last two years, the WAPA has been in contact with plaintiff Near regarding his trees in the easement. On September 11, 2001, WAPA sent plaintiff Near a letter advising that two redwood trees on his property would be removed because they were growing into the clearance zone required for safe operation and maintenance of the transmission line and were hindering access to the tower. On October 11, 2001, WAPA again contacted plaintiff Near to advise him that three redwood trees would be removed the week of October 22, 2001. Near responded and the trees were not removed at that time. On October 31, 2001, WAPA sent Near a letter giving notice to remove the shed which was on the easement and that Near must trim a large oak tree within 30 days, in accordance with a tree-trimming agreement between Near and WAPA, or WAPA would have to remove it. The letter further indicated that the oaks, oleanders,

and photinias planted on Near's property would be monitored by WAPA and removed if they violated a License Agreement between Near and WAPA,[1] or other contract rights. The letter also reiterated that the two redwood trees, plus a newly-planted redwood, would be removed. On January 8, 2002, WAPA contacted plaintiff Near and informed him that the three redwood trees would be removed on January 9, 2002. WAPA also contacted plaintiff Sara Myers and informed her that the removal of her trees was scheduled for January 9, 2002.

In response, plaintiffs commenced this litigation. The parties have agreed that during the pendency of the litigation, the government would not remove the trees provided that the plaintiffs agreed to trim the vegetation and trees in such a way that they do not interfere with the government's safe operation and maintenance of the transmission lines.

## II.

## ANALYSIS[2]

### A. CHOICE OF LAW

The government asks this court to decide whether the plaintiffs' structures violate the terms of the easement, and also whether the easement permits the government to remove certain of plaintiffs' trees. In interpreting the scope of the easement with reference to the trees and structures at issue, the first question is what law applies.

As noted, the easement in issue was derived from the government's 1952 Decla-

---

**1.** On May 27, 1997, plaintiff Near entered into a License Agreement with the WAPA which allowed him to install a swimming pool and deck area on his property that could encroach on the transmission line easement a maximum of two feet. *See* License Agreement, Def's Exh. G at 1. The Agreement included a provision that landscaping was restricted to trees and plants that would not

exceed 12 feet in height nor obstruct access along the easement. *Id.* at 2 ¶(i).

**2.** The standards for disposition of motions for summary judgment are well known and need not be repeated here. *See, e.g., Newman v. Checkrite California, Inc.,* 912 F.Supp. 1354, 1362–64 (E.D.Cal.1995).

ration of Taking. Before undertaking my own analysis, I must determine whether the Ninth Circuit has resolved the issue of what law applies in an action to enforce an easement that was acquired by condemnation proceedings. I conclude that it has not.

In two cases, the Circuit has applied state law to "determin[e] the nature and extent of the interest" "[w]here the United States acquires an interest in land by deed." *County of Santa Barbara v. United States,* 269 F.Supp. 855, 857 (C.D.Cal. 1967). In *Los Angeles & Salt Lake R. Co. v. United States,* 140 F.2d 436 (9th Cir. 1944), in a controversy over the Government's rights under deeds it had acquired from the Railroad Company, the Circuit explained that "[s]ince the land [the deeds] describe is situated in California, interpretation of the deeds is governed by California law." *Id.* at 437. *See also Coos County Sheep Co. v. United States,* 331 F.2d 456, 460 (9th Cir.1964)(applying Oregon law to determine what rights the United States had acquired under its easement, simply noting that the parties were in agreement that the state's real property law applied).

Clearly these cases are not dispositive. The contract at issue in the railroad case was entered into between private parties before the government acquired an interest, and thus construction was resolved by resort to state law under *Erie* principles. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In *Coos County,* the parties' agreement concerning the applicable law short-circuited the need for analysis. I thus conclude that the issue before the court is one of first impression in this Circuit.

The government points to two out-of-circuit cases in which federal courts, in determining the applicable law, apparently found it significant that the interests in land were obtained by condemnation. *See*

*United States v. Pinson,* 331 F.2d 759, 760 (5th Cir.1964)(stating, without explanation, that federal law governed the interpretation of the declaration of taking); *Bumpus v. United States,* 325 F.2d 264, 266 (10th Cir.1963)(noting that both parties agreed that federal law controlled since the condemnation was under federal law). Both courts acknowledged that they had found no federal law governing the inquiry, and concluded that the courts should resort to "general law" in construing the easements. *See Pinson,* 331 F.2d at 760; *Bumpus,* 325 F.2d at 266. As I explain below, I too find it significant that the easement was acquired by condemnation. I cannot agree, however, that condemnation justifies resort to "general law," whatever that might be.

■ The government obtained the property interest in the case-at-bar by condemnation, that is, by the exercise of its sovereign power. The extent to which the federal government has exercised its sovereign power, must, by virtue of the Supremacy Clause, be determined by federal law. *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943)(where the government's authority is rooted in the Constitution or the statutes of the United States, it is for the federal courts to fashion the governing rule of law). Having determined that federal law applies, it does not follow that state law has no role to play.

■ Ordinarily, where there is "no clear federal law to apply, federal courts have referred to state law to provide the appropriate rule ...." *United States v. Nationwide Mutual Ins. Co.,* 499 F.2d 1355, 1356–57 (9th Cir.1974). "[S]pecific aberrant or hostile state rules," however, are an exception as they "do not provide appropriate standards for federal law." *See id.* (quoting *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 596, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973)).

In *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), the Supreme Court considered an action in which the United States had acquired title to land pursuant to the Migratory Bird Conservation Act, both by purchase and by condemnation. There, as here, the land acquisition agreements were "explicitly authorized, though not precisely governed, by the Migratory Bird Conservation Act."[3] *Id.* at 593, 93 S.Ct. 2389. Noting that "state law at times was the appropriate federal rule," *id.* at 595, 93 S.Ct. 2389 (quoting *Clearfield Trust v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943)), the Court concluded that Louisiana state law could not appropriately be applied because the state statute had been passed in an attempt to abrogate the explicit terms of the federal land acquisition program. *Id.* at 597, 93 S.Ct. 2389. That is to say, application of state law would be inimical to the federal program. Here, there is no reason to believe that California law concerning the interpretation of easements is aberrant or hostile to the Reclamation Act. Accordingly, I conclude that California's law is incorporated as the rule of decision in the instant case.

## B. RELEVANCE OF WAPA GUIDELINES

A question related to the choice of law inquiry concerns WAPA's General Guidelines. The Government cites to the guidelines as authority to support its contention that the plaintiffs are encroaching upon the easement in violation of the Declaration of Taking. As noted above, the fact that the Reclamation Act authorized the taking does not transmute the construction of the easement into a question of federal administrative law. Thus, whatever effect the guidelines have on constraining government action, they do not, ab initio, define the government's powers vis-a-vis the plaintiffs. The Ninth Circuit has addressed the ineffectiveness of regulations to modify easements in *Racine v. United States*, 858 F.2d 506 (9th Cir.1988), a case involving the interpretation of a scenic easement acquired by the Government. There, the easement provided "with reference to 36 C.F.R. § 292.16(g)(1) [which provided for structures necessary for dude ranching], it is agreed that only one residence and one tenant dwelling are authorized within the easement area." The Circuit noted that, despite the easement's reference to a regulation, "[t]he Secretary's interpretation of the easement is not entitled to deference because it did not involve an interpretation of a statute or regulation." *Racine v. United States*, 858 F.2d 506, 508 (9th Cir.1988).

The matter-at-bar presents a somewhat different issue. Here, the easement

---

3. The parallel between the land acquisition agreements in *Little Lake* and the easement acquired in this case is noteworthy in light of the government's alternative argument. Beginning from the fact that the declaration of taking was obtained pursuant to the Reclamation Act, which authorized the condemnation, the government argues that because the Act contains no specific instruction as to how easements should be maintained, actions taken by the agency in regards to its easement are committed to the agency's discretion, and thus beyond judicial review under *Heckler v.*

*Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). Of course, the fact that an agency was authorized to obtain easements via condemnation does not suggest that the agency's discretion would not be limited by the terms of an easement, or would otherwise be beyond review. Certainly the *Little Lake* Court did not conclude that interpretation of such agreements was left to the discretion of the agency. Rather, the Court went on to decide whether federal or state law should govern the interpretation of the agreements conveying the interests to the government.

provides the government with power to make decisions concerning whether vegetation and objects are "considered dangerous" to the towers and electric lines. Thus, to the extent the general guidelines implement that decisionmaking power, they are not merely like the regulations in *Racine,* but are the exercise of a right obtained by virtue of the easement. Accordingly, the court must consider what force the guidelines have in interpreting the Declaration of Taking. As I now explain, the general guidelines have, at most, only limited persuasive value.

I begin by noting that the guidelines have not been adopted pursuant to the administrative procedure involving formal adoption as regulations by publication in the Federal Register, etc. Accordingly, even if the construction of the easement were a question of federal administrative law, the guidelines would have only persuasive value. *See, e.g., Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). Moreover, by their terms, the guidelines provide that they serve "only as a guide," and require that each encroachment will be evaluated "on an individual basis." General Guidelines, Pl's Exh. M. Given the need for individual evaluation, the guidelines deserve little, if any weight.[4] The question is whether the government's proposed action comports with the easement, a question, as explained above, to which California law

supplies the rule of decision. I now turn to that law.

## C. INTERPRETATION OF THE EASEMENT UNDER CALIFORNIA LAW

In construing a grant such as an easement, the rules applicable to the construction of contracts generally apply. *See* Cal. Civ.Code § 1066; *Kerr Land & Timber Co. v. Emmerson,* 233 Cal.App.2d 200, 219, 43 Cal.Rptr. 333 (1965). With this in mind, I discuss the easement at hand in relation to the alleged encroaching structures and to the trees.[5]

### 1. *Structures*

■ As a starting point, I note that the "words in a contract are to be understood in their ordinary and popular sense...." Cal. Civ.Code § 1644. Here, the plain language of the Declaration of Taking specifies that the landowner does not retain the right to "erect buildings or structures." Declaration of Taking, Pl's Ex. A at 4:26–28. This prohibition is clear. Less clear is the evidence concerning whether or not the plaintiffs are in violation of this portion of the easement. As to the Myers, the government's brief states that they have some kind of barn or stables on the easement portion of their property. The government, however, has not submitted admissible evidence that the alleged stables are on the Myers' property.[6] Nor has the

---

**4.** A different issue might be tendered if the guidelines had been formally adopted and cast in terms of minimum standards of safety. They were not.

**5.** The government has cited to several cases in which a court has enforced an easement. Those cases dealt with a different easement and different encroachments, and thus provide little guidance. The more telling precedent is that which articulates the standards for resolving cases involving alleged encroachments.

**6.** Defendant submits the declaration of Heidi Miller, which states that "Western discovered a horse barn or stable located on the Myers' property ... within the transmission line easement." The personification of the agency does not in any way help the government's case. On the present record, plaintiffs' objections for lack of foundation and personal knowledge are well-taken.

As to the two photos submitted as exhibits J and K to the Declaration of Geoff Buchholz, although they depict what appears to be a horse corral, the supporting declaration

government provided evidence that the alleged barn or stables were erected after the Declaration of Taking. As the Declaration of Taking only prohibits "erect[ing] buildings or structures," a preexisting structure would not violate this provision of the easement.

Since the government is moving on its counter-claim, it is not enough that it make an allegation and put the plaintiffs to their proof. Rather, the government would bear the burden of proof at trial and thus must present some evidence before this court can find that no genuine issue of material fact remains. Fed.R.Civ.P. 56(c). Thus, on the evidence that is before the court summary judgment is inappropriate as to the Myers' alleged structures.

■ As to the storage shed on the Near/Mayhugh property, plaintiffs do not dispute that it was placed on the easement by Near well after the Declaration of Taking. Thus, as an initial matter, it would appear to violate the terms of the easement. Near, however, declared that WAPA's representative, Joan Wheatley, gave him permission to place the storage shed in its location on the easement. As I explain, this evidence creates a genuine issue of material fact as to whether or not defendant can enforce the prohibition on structures.

■ In essence, Near contends that he was given a parol license to erect a storage shed on the easement. *See Eastman v. Piper,* 68 Cal.App. 554, 560, 229 P. 1002 (1924)(license is personal permission or authority to do one or more acts on the land of another, and may be created by parol). Of course, ordinarily this argument would do Near no good since licenses are usually revocable. *See id.* Here, however, plain-

tiff can contend that the alleged license was irrevocable because,

> where a licensee has entered under a parol license and has expended money, or its equivalent in labor, in the execution of the license, the license becomes irrevocable, the licensee will have a right of entry upon the lands of the licensor for the purpose of maintaining his structures or, in general, his rights under the license, and the license will continue for so long a time as the nature of it calls for.

*Higgins v. Kadjevich,* 186 Cal.App.2d 520, 523–24, 9 Cal.Rptr. 115 (1960)(quoting *Stoner v. Zucker,* 148 Cal. 516, 520, 83 P. 808 (1906)); *see also Noronha v. Stewart,* 199 Cal.App.3d 485, 245 Cal.Rptr. 94 (1988).

To discuss Near's placement of the shed in terms of an irrevocable license, however, is not the end of the matter. Because the doctrine of irrevocable license is derived from the principles of equitable estoppel, *see Higgins,* 186 Cal.App.2d at 524, 9 Cal.Rptr. 115, it is appropriate to consider the defendant's contention that a party may not assert equitable estoppel against the government.

■ The government cites to *Rider v. United States Postal Service,* 862 F.2d 239 (9th Cir.1988), for the proposition that absent a showing of "affirmative misconduct beyond mere negligence," the "federal government may not be estopped . . . ." *Id.* at 240. While it is a general rule that "the United States is neither bound nor estopped by acts of its officers or agents entering into an arrangement or agreement to do . . . what the law does not sanction or permit," *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37

makes no mention of the corral, nor does it aver that it is on the Myers' property and within the easement. Whatever the actual

facts may be, the present record simply does not support the government's factual assertion.

S.Ct. 387, 61 L.Ed. 791 (1917), the estoppel bar does not apply where the law does "sanction or permit" the agreement entered into by the agent. *See United States v. Georgia–Pacific Co.,* 421 F.2d 92, 100(9th Cir.1970)(noting that one circumstance in which equitable estoppel may be found against the government is "if its representative has been acting within the scope of his authority"). The question of authority, then, is crucial to disposition of this aspect of the case.

■ It is undisputed that the WAPA granted Near a license to extend his pool facility into the easement. Who granted that license, and the circumstances under which it was granted, are not revealed by the present record. The court's obligation on summary judgment is to draw all reasonable inferences adverse to the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is not unreasonable to infer, given the undisclosed circumstances, that the government's representative also had authority to, and did grant Near a license to erect a shed on the easement. Although defendant presents evidence suggesting that its representative did not do so, Near's sworn declaration to the contrary creates a genuine issue of material fact on the issue.

### 2. *Trees*

The Declaration of Taking does not prohibit trees. It does, however, provide the government with the right to trim or remove trees "considered by the United States to be dangerous" to the towers, poles and lines. Declaration of Taking, Pl's Exh. A at 3:27–32. Defendant thus has the right to remove the trees at issue if the evidence shows that they interfere with the transmission lines or that they are "considered by the United States to be dangerous" to the transmission lines.

There are several difficulties with defendant's contention that it is entitled to cut down plaintiffs' trees because the United States considers them dangerous. First, there is no evidence before this court concerning who in the WAPA has the authority to make this decision for the United States, or whether the allegation here that plaintiffs' trees are dangerous indeed originated with a person or body with such authority.

■ In support of its contention that plaintiffs' trees are dangerous, the government points to the WAPA guidelines, which, "for the safety of the public," allow trees to reach a maximum height of twelve feet. *See* General Guidelines, Pl's Exh. M at 1 ¶ 1. As noted above, however, the WAPA guidelines make clear that they serve "only as a guide," and that each situation is assessed individually. *See id.* at 1. Thus, the question remains as to who has authority to make an individual assessment, and whether such an assessment was made.

Second, regardless of who is authorized to determine that the plaintiffs' trees are dangerous, under California law that person or body must have exercised the discretion to make that determination consistent with the implied covenant of good faith and fair dealing. *See Perdue v. Crocker Nat'l Bank,* 38 Cal.3d 913, 923, 216 Cal.Rptr. 345, 702 P.2d 503 (1985) (" 'where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing.' [citations]"). Here, as I now explain, there is a genuine issue of material fact as to whether a determination that the trees are dangerous is consistent with the covenant of good faith and fair dealing.

### a. California's Implied Covenant of Good Faith and Fair Dealing

▮▮▮▮ The implied covenant of good faith and fair dealing may be violated if the party with discretion "subjectively lacks belief in the validity of its act or if its conduct is objectively unreasonable." *Carma Developers (California), Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 372, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992). Whether the court looks to objective or subjective factors depends upon the terms of the contract. *See Ri-Joyce, Inc. v. New Motor Vehicle Bd.*, 2 Cal.App.4th 445, 457, 3 Cal.Rptr.2d 546(1992)("A contract that confers discretionary decision-making authority upon one of the parties may be construed to require an objective standard of reasonableness or may be construed to permit the party to make a decision based on subjective factors. In either case it will be implied that the party must exercise its judgment in good faith").[7]

Two California Supreme Court cases address the proper application of the objective/subjective standards. In *Kendall v. Ernest Pestana, Inc.*, 40 Cal.3d 488, 220 Cal.Rptr. 818, 709 P.2d 837 (1985), the Court considered a clause in the lease requiring the consent of the lessor before the lessee could sublet. The lessor contended that he should be able to deny the lessee the right to sublet by virtue of the clause. The court determined that an objective standard of commercial reasonableness should apply to the decision not to allow the lessee to sublet. *Id.* at 500, 220 Cal.Rptr. 818, 709 P.2d 837. It reasoned that, where a lease permitted subleasing with the consent of the lessor, "it suggests

or connotes that, when the lessee obtains a subtenant acceptable or satisfactory to the lessor, he may sublet ... Otherwise the provision. simply would prohibit subleasing." *Id.* at 503, 220 Cal.Rptr. 818, 709 P.2d 837 (citations and emphasis omitted). Beyond this observation, however, the court also looked to the effect that the denial of the sublease would have to ascertain whether it would give the lessor advantages beyond those bargained for in the original contract. To the argument that the lessor should be able to deny the sublet and rent directly to the sublessee at increased rates, the Court observed "[r]espondent here is trying to get *more* than it bargained for in the lease. A lessor is free to build periodic increases into the lease ...." *Id.* at 504–05, 220 Cal.Rptr. 818, 709 P.2d 837. *See also Carma Developers v. Marathon Development California, Inc.*, 2 Cal.4th 342, 372 n. 11, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992) (citation omitted)("Bad faith performance occurs precisely when discretion is used to recapture opportunities forgone upon contracting ....").

Several years later, another lessor included a recapture clause in the lease which provided that the lessor could terminate the entire leasehold upon the lessee's request for permission to sublet. *See Carma, supra.* The lessor asserted the recapture clause when the lessee proposed to sublet, and the lessee sued, arguing that the lessor lacked a commercially reasonable basis for denying their sublet, as their sublessee was reliable. The court rejected the argument. It concluded that, where the parties explicitly bargained for a provision that would allow the lessor to terminate a lease in order to take advantage of the increased rates it could charge a sub-

---

7. One California Court of Appeal has held that the parties may contract out of the covenant of good faith and fair dealing. *See Third Story Music, Inc. v. Waits*, 41 Cal.App.4th 798, 808, 48 Cal.Rptr.2d 747 (1995)(citing *Carma Developers (Cal.), Inc. v. Marathon De-*velopment California, Inc.*, 2 Cal.4th 342, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992)). Whatever the merits of *Waits*, there is no suggestion that it has application to the instant case.

lessee, enforcement of the provision would not violate the covenant of good faith and fair dealing. Thus, the court did not look to the commercial reasonableness requirement where doing so would undermine the express provision of the contract. *See id.* at 374, 6 Cal.Rptr.2d 467, 826 P.2d 710.

For the purpose of disposing of the instant motion, I need not decide whether the easement in this case requires objective reasonableness or merely subjective good faith under *Kendall* and *Carma, supra.* As I explain below, a genuine issue of material fact remains, whether the required good faith is viewed under an objective or subjective standard.

### b. Examining the Determination of Dangerousness for Good Faith

The government tenders a number of bases for its asserted determination that plaintiffs' trees should be cut down as an interference or danger to the lines. As an initial matter, I note that each basis is questionable given the fact that the government has allowed the plaintiffs to "trim the vegetation and trees in such a manner so that they do not interfere with the government's safe operation and maintenance of the government's transmission lines." Government's Statement of Undisputed Facts ¶ 33. This agreement, by itself, creates a genuine issue of material fact both as to the government's subjective belief, and to the objective reasonableness of the government's position that the trees,

even as trimmed, present a danger and must be cut down.[8] Moreover, the given bases for the government's purported determination that the trees are dangerous also leave a genuine issue of material fact as to the objective and subjective good faith of that determination.

First, the government contends that the trees on both of plaintiffs' properties are too tall, such that flash-over from the transmission lines to the trees could result in power outages and that arcing electricity from sagging transmission lines could result in fire. According to the declaration of the government's own witness, WAPA electrical engineer Steve Rock, however, the trees are not too tall. Rock declared that, consistent with a WAPA order, there needed to be 18 feet between the transmission line and a tree. According to Rock, only when the distance was less than that did a tree need to be trimmed or removed. Rock Decl. ¶¶ 4,5. Defendant tenders evidence that even the tallest tree does not have less than 18 feet between it and the power line. *See* Buchholz Decl. ¶ 12 (tallest tree within Myers' easement is 35 feet and 18 feet from line). Further, from the opinion of one of defendant's retained experts, it appears that the Myers' trees are twenty-four feet from the power line. *See* Tate Opinion, Def's Reply, Exh. A.[9] As to Near's trees, plaintiff conceded that at their tallest point during this litigation they were thirty feet high; however, they are now topped and trimmed.[10] Thus, a

---

**8.** It is somewhat troubling that the government's apparent good faith effort to maintain the status quo pending litigation works against the resolution of the litigation in its favor. Nonetheless, the court must assume that the government would not have entered into the agreement if there was a genuine threat of imminent danger.

**9.** The court notes that the declaration is not signed under penalty of perjury.

**10.** Defendant submits the unsworn opinion of a retained expert, who states that pruning and

topping the conifers at issue is "not a correct arboricultural practice" as it would cause multiple sprouting of twigs, weakly attached to their parent stems, and increase the potential for limb breakage. *See* Tate Opinion, Def's Reply, Exh. A ¶ II. Even if such an unsworn opinion were admissible, however, it fails to explain whether said breakage refers to the new shoots or large, heavy limbs, and how limb 'breakage would result in interference with lines or danger to lines as the easement requires.

genuine issue of material fact remains as to whether the government has determined in good faith that the trees are dangerous by virtue of their height.

Second, defendant contends that the proximity of the trees on the Near/Mayhugh property to the transmission tower poses a threat to the structural integrity of the tower. Geoff Buchholz, WAPA Line Foreman, has declared that tree limbs can bend the towers' steel construction. Buchholz Decl. ¶ 7. There is a material issue, however, as to whether trimming would resolve this problem, as the tree-trimming agreement during this litigation suggests.[11]

In addition to the problems that large limbs could cause, WAPA structural engineer, Terry Burley, declared that the redwood trees on the Near/Mayhugh property were a safety issue due to the potential for the trunks and limbs to affect the structural integrity of the tower and footings. Burley cited the possibility of a tree falling against the tower and the potential for the trees' roots to interfere with the tower's footings. *See* Burley Decl. ¶ 5. Another expert retained by WAPA, Steve Tuggle, voiced a similar concern in a letter to WAPA Management Analyst, Heidi Miller, stating that, although the redwood trees could potentially coexist with the tower footings in Near's raised beds, there was potential for the roots to interfere with the tower footings in future years because of their diameter and height. Pl's Opposition, Exh. L at 2. Near has declared, however, that at a meeting with one Sue Sinclair and Steve Tuggle, Sinclair asked whether either the trunk or root system of the redwood trees would in any way endanger the tower footing, and Tuggle responded, "absolutely not." Near Decl. ¶ 29. Near's evidence of a contrary opinion by one of defendant's experts creates a

genuine issue of material fact as to whether the government has determined in good faith that the redwoods pose an interference or danger to the tower's structure.

Third, defendant points to the possibility of electrocution for young, wayward children. The government cites the unsworn opinion letter of Robert Tate for the proposition that trees provide a means of ready access for climbing onto towers, and that young people are electrocuted each year by using trees near poles/conductors. *See* Reply Exh. A ¶ IV. The government then points to photos of the Near/Mayhugh's neighbors' backyard with children's play equipment. *See* Buchholz Ex. C. Even if the unsworn opinion of Tate were admissible, there is no evidence that this expert has any expertise in accidental death statistics related to transmission towers. Furthermore, evidence that the WAPA has approved other trees for planting in close proximity to towers, *see* Near Decl. ¶ 30, Suppl. Miller Decl. ¶ 8 and Exh. A, suggests that trees do not pose the danger referenced by Tate, or that the government does not believe that they do. Indeed, it is difficult to see why children would need trees to provide ready access to the towers, since the towers themselves appear to be tantalizingly climbable to any adventurous child. Thus, a genuine issue of material fact remains as to whether or not the government has determined in good faith that the trees are dangerous because of the possibility that children may be electrocuted.

Fourth, the defendant argues that the proximity of the trees to the tower poses a danger because, in an emergency, the delay of having to negotiate around the trees poses a danger to the public and the crew performing the emergency maintenance.

---

11. This may be a question of long-term versus short-term danger. The record before this court, however, does not address that distinc-

tion and, as noted, the court must draw all reasonable inferences adverse to the moving party.

*See* Buchholz Decl. ¶ 9. This basis is called into question by Near's declaration that defendant has informed him of other approved trees that could be grown in the same location. *See* Near Decl. ¶ 30. Near submits a photograph of one type of approved tree, photinia, that is quite bushy and would appear to pose the same interference as the redwoods. *See* Pl's Oppo. Exh. N, last photo. While defendant has responded that the photinia in the photo is of a type that is taller than the approved photinia, *see* Suppl. Miller Decl. ¶ 8, they have not disputed that the approved photinia would not also be bushy and block off the side of the tower facing the Near residence. Thus, a genuine issue of material fact remains as to whether the government has determined in good faith that the trees are dangerous by virtue of this fourth purported basis.

## III.

## CONCLUSION

Based on the foregoing, the court hereby ORDERS as follows:

1. Defendant's motion for summary judgment is DENIED.

2. In their trial briefs, the parties shall brief whether, under California law, this court should look to the government's good faith using an objective standard or a subjective standard.

3. The Pretrial Conference in this matter, currently set for May 12, 2003, is CONTINUED to June 16, 2003 at 3:30 p.m.

4. Defendant shall file its separate pretrial statement not later than fifteen (15) days from the effective date of this order.

5. If necessary by virtue of this order, the parties shall file any amended joint or separate pretrial statements within thirty (30) days from the effective date of this order.

IT IS SO ORDERED.

DATED: May 6, 2003.